William McNABOLA, Plaintiff–Appellee,

v.

CHICAGO TRANSIT AUTHORITY,
Defendant–Appellant.

No. 92–1133.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1992.

Decided Nov. 24, 1993.

504

Linda Friedman (argued), Richard C. Leng, Leng, Stowell, Friedman & Vernon, Nicholas J. Motherway, Mark E. McNabola, Motherway & Glenn, Chicago, IL, for plaintiff-appellee.

Mitchell Ware (argued), Dianne McCollough, Jones, Ware & Grenard, Chicago, IL, for defendant-appellant.

Before RIPPLE and ROVNER, Circuit Judges, and ENGEL, Senior Circuit Judge.[*]

ILANA DIAMOND ROVNER, Circuit Judge.

William McNabola maintains that the Chicago Transit Authority (the "CTA") discriminated against him on account of his race when it terminated his relationship with the CTA. The jury found that the CTA's Board of Directors had a custom or policy of terminating whites similarly situated to McNabola and that McNabola had been terminated pursuant to that custom or policy. The jury

[*] The Honorable Albert J. Engel, Senior Circuit Judge for the Sixth Circuit, sitting by designation.

accordingly awarded back pay and future losses, and also compensated McNabola for emotional distress. The district court, after ordering a remittitur of the jury's damage verdict, awarded prejudgment interest, attorney's fees, and costs. The CTA appeals, and we affirm all but the award of prejudgment interest.

## I. BACKGROUND

In April or May of 1983, the CTA hired McNabola, a white male, as an independent contractor on a *per diem* basis to perform in-house medical examinations of CTA employees seeking worker's compensation benefits. McNabola was a physician who specialized in "industrial medicine," and he had completed over 45,000 worker's compensation evaluations over the course of his career. John Demaret was the CTA's General Counsel when McNabola was hired. McNabola's relationship with the CTA was never formalized through a written contract, but he worked for the CTA a few hours on both Tuesdays and Thursdays at the rate of fifty dollars per hour until he was terminated in October 1986.[1]

The CTA created McNabola's position in an attempt to investigate what it perceived to be phony worker's compensation claims by CTA employees. Patients were sent to McNabola by the CTA's claims adjusters, and he then was responsible for evaluating the nature and extent of their injuries and for making a determination as to whether they were able to return to work. At the same time it hired McNabola, the CTA also hired three white investigators whose job it was to determine whether claimants were at home or working elsewhere. This "in-house" policing program was generally a success, as an internal CTA audit disclosed that claims had dropped from $10 million in 1981 to $4.9 million in 1984. The 1985 internal CTA audit

stated: "The return to in-house control coupled with the even more important innovation of investigations and controlled medical examinations has resulted in a dramatic reduction of expenditures and pay outs reducing costs by several million dollars a year." (Pl.Ex. 4, at 2.) Indeed, McNabola sent approximately seventy percent of the claimants he examined back to work.

The CTA replaced McNabola in 1986 with Dr. David Reid, an African–American orthopedic surgeon who had conducted fewer than twenty "fitness-for-duty" evaluations prior to his work with the CTA. The CTA paid Reid $75.00 per hour, $25.00 more per hour than it had paid McNabola.[2] After a time, the claims adjusters stopped sending suspicious claims to Reid for evaluation because Reid tended to go along with the recommendation of the employee's treating physician and generally did not send the employee back to work. Claims in the CTA's Worker's Compensation Department rose from $6 million in 1985 to $9 million in 1988.

The parties offer divergent views for McNabola's termination. McNabola contends that he was fired pursuant to the "reverse discrimination" policy of the CTA Board. Under McNabola's theory, his problems began when Joyce Hughes, an African–American female, was named the CTA's General Counsel in April 1984. McNabola posits that Hughes, with the acquiescence of the CTA Board, embarked on a policy of terminating white *per diem* professionals and replacing them with African–Americans.[3] McNabola pointed to evidence relating to treatment of the CTA's *per diem* attorneys to support his charge. The evidence revealed that the CTA maintained a list of attorneys who it hired on a case-by-case basis. Before Hughes' tenure with the CTA, six of the approximately sixty-one individual

---

**1.** By the time of his termination, McNabola was working approximately ten or eleven hours a week for the CTA.

**2.** When she fired McNabola, the CTA's General Counsel Joyce Hughes also ordered that the claims adjusters not send any referrals to McNabola's private office, and she prohibited the CTA's Director of Tort Litigation from referring cases to McNabola. Hughes also transferred the

three white investigators who had been hired along with McNabola to another department, thus effectively dismantling the CTA's in-house policing program.

**3.** In fact, McNabola maintained that in firing him, Hughes stated "I finally got down to you. What do you do at the CTA?" Hughes denied the statement.

attorneys and five law firms on the list were African–American. Thus, approximately nine percent of the CTA's *per diem* attorneys were African–American, although African–Americans made up only three percent of the practicing attorneys in the greater Chicago area. After Hughes became General Counsel, however, over seventy percent of the *per diem* attorneys retained by the CTA Board were African–American.

The CTA Board had the final authority to hire and fire *per diem* attorneys. Hughes would recommend, either to the Board or to a Board Committee, attorneys for inclusion on the *per diem* list. She also would approve and pass on to the Board the names of those attorneys who had been recommended by others. It was the Board, and not Hughes, that made all final decisions concerning the retention or procurement of CTA independent contractors such as the *per diem* attorneys.

In addition to the *per diem* attorney statistics, there also was evidence that white employees were disgruntled with their treatment by CTA officials. John Hoellen, a member of the CTA's Board, testified that approximately forty-seven terminated employees had petitioned the Board to hold hearings on their dismissals during Hughes' tenure as General Counsel. He stated that the number of petitions represented a marked increase over prior years and that the petitioners were largely white employees who charged reverse discrimination. Hoellen "deplored" the situation because he believed that many of those dismissed were "very capable people."

The jury also heard extensive testimony about the fate of Lorene Murray, a white woman who had been the Director of General Law and the legal division's highest ranking woman in 1984 and 1985. Hughes placed Murray on probation, telling her that she was "not on [Hughes'] team" and that Hughes had not brought her in. Murray ultimately resigned in 1987 because she found the working conditions intolerable and because she believed that Hughes had initiated a campaign to drive her out on account of her race. When Hughes subsequently left the CTA, Murray returned to a position with the CTA's Legal Department.

The CTA, on the other hand, maintains that race played no role in McNabola's termination. Instead, it offers a litany of problems and concerns that ultimately prompted Hughes to terminate the relationship. For example, the CTA attributes the general success of the in-house control program to the fact that McNabola may have been overzealous. The patients examined by McNabola frequently complained about rough treatment; the CTA showed that it received approximately one such complaint per week.[4] Several of the complaints were from women who indicated that McNabola had examined or probed their chests when that was not the location of their injuries. Indeed, in response to complaints about painful examinations, the CTA in 1984 began to require that a third person observe all of McNabola's exams.

The CTA also focused on two letters from hospitals complaining that McNabola had made unauthorized examinations of CTA employees while they were patients at the hospitals. The Chief Executive Officers of both Palos Hospital and St. Bernard's Hospital wrote letters to the CTA's medical director in 1985 to complain about McNabola making unauthorized hospital visits. St. Bernard's CEO threatened to have McNabola arrested and promised to hold the CTA responsible for his conduct.

Finally, the CTA maintained that McNabola had utilized a CTA prescription pad for a private patient, thereby putting the weight of the CTA behind his statement on the pad. The note was directed to the Plaza Limousine Company and stated that one of McNabola's private patients was taking Hydrodiural but that he was capable of driving a limousine.[5]

---

4. In July 1986, the presidents of Locals 241 and 308 of the Amalgamated Transit Unions met with Hughes to discuss complaints from union members about McNabola's examinations.

5. The jury also heard testimony indicating that the Illinois Department of Registration and Education ("IDRE"), which is responsible for licensing Illinois physicians, had revoked McNabola's license to prescribe controlled substances and

McNabola filed this action on August 8, 1988, alleging in count I of a two-count complaint that the CTA and three individuals, one being Joyce Hughes, had campaigned to drive out white upper-level management and other employees from the CTA and to replace them with African–Americans. McNabola alleged in count II that he had been discharged in violation of his first amendment free association rights because he had supported two white aldermen who were rivals of the late Mayor Harold Washington. The district court dismissed the individual defendants without prejudice but found that McNabola had stated a claim for race discrimination against the CTA under 42 U.S.C. § 1983. The case proceeded to trial on February 19, 1991, and the jury returned its verdict on March 4, finding in response to special interrogatories that "the Chicago Transit Authority had a custom or policy of terminating white *per diems*" and that "there was a causal connection between a policy or custom of terminating white *per diems* and [McNabola's] termination." The jury awarded McNabola past lost wages of $286,084.90, future lost wages totaling $78,-330.76, and compensation for mental distress in the amount of $15,000.00, resulting in a total of $379,415.66. On September 11, 1991, the district court ordered a remittitur of $112,658.85 to the past and future lost wage components of the jury's verdict, reducing McNabola's award to $265,756.81.[6] The district court subsequently awarded McNabola $20,438.55 in prejudgment interest, $185,-653.00 in attorney's fees, and $13,630.79 in costs. The CTA appeals.

## II. DISCUSSION

### A. Policy Claim

The CTA first contends that the jury held it responsible for Hughes' actions when there was no evidence that Hughes acted pursuant to an official CTA policy, practice, or custom, as required under section 1983. The CTA's argument is two-fold. It maintains as a legal matter that the district court (and therefore the jury) impermissibly imposed liability under a *respondeat superior* theory in that it held the CTA responsible solely for the acts of its employee Hughes. In addition, the CTA contends that as a factual matter, there is no evidence to support McNabola's theory that he was terminated pursuant to a policy, practice, or custom of the CTA Board.

 It is by now well settled that liability under section 1983 may not be imposed against a municipal entity under a theory of *respondeat superior. Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, — U.S. —, —, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993); *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir.1993). Rather, *Monell* and subsequent cases make plain that the CTA only is responsible for its employees' actions if taken pursuant to an unconstitutional policy or custom of the CTA itself. *Monell*, 436 U.S. at 690, 98 S.Ct. at 2036; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–22, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988); *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir.1993); *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir.1992). Recovery from a municipal entity is therefore "limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *see also Fiorenzo v. Nolan*, 965 F.2d 348, 350 (7th Cir.1992). It is the plaintiff's difficult burden to establish the municipality's imprimatur on the uncon-

had placed McNabola on probation for five years. McNabola maintained that he had lost his license as the result of poor recordkeeping which had caused him to overprescribe a particular drug to some of his patients. He testified that he had taken a remedial course in medical recordkeeping and that his license had been reinstated in 1984. He never told the CTA about this incident because he was never asked about it.

Hughes stated that she had been aware of the IDRE's ongoing investigation into McNabola's medical practice but that it had no impact on her decision to terminate McNabola.

6. If McNabola had not accepted the remittitur, the district court would have ordered a new trial on the issue of past and future lost wages.

stitutional conduct, and in *Cornfield*, we explained that he may attempt to meet that burden by looking to "the official pronouncements of [the] municipal or legislative bod[y], agency action in accordance with delegated authority, actions by individuals with final decisionmaking authority, inaction or custom." 991 F.2d at 1324. Moreover, the plaintiff must show a "direct causal link between the municipal policy and the constitutional deprivation." *Tapia*, 965 F.2d at 338.

■■■ The CTA argues that liability was imposed for Hughes' act of terminating McNabola's employment and that Hughes did not have final policymaking authority for the CTA. Defendant is correct to the extent that the decisions of an employee without authority to set official policy provide an insufficient basis for the imposition of liability against the governmental entity under section 1983. *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924; *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1299; *see also Fiorenzo*, 965 F.2d at 350; *Woods v. City of Michigan City, Indiana*, 940 F.2d 275, 278 (7th Cir.1991). Courts must look to state law in ascertaining the identity of policymaking officials. *Praprotnik*, 485 U.S. at 124–25, 108 S.Ct. at 924–25; *Cornfield*, 991 F.2d at 1325; *Fiorenzo*, 965 F.2d at 350. The CTA has no quarrel with the district court here, however, because the court instructed the jury that Hughes had no authority to establish official CTA policy and that only the Board had the requisite policymaking authority:

> The Board of Directors of the Chicago Transit Authority is the final policy-making authority for establishing the employment practices of the Chicago Transit Authority. Its General Attorney, Joyce Hughes has no authority to establish policy by herself. It is for you to decide whether the deprivation of rights claimed by plaintiff was caused by an act of official policy of the Chicago Transit Authority.

(Tr. at 1648–49.) The court further instructed the jury that

> [i]n deciding whether the plaintiff was deprived of his constitutional rights by a policy of the Chicago Transit Authority Board you should consider only whether an official policy of the Chicago Transit Authority Board commanded that the deprivation occur, or whether the Board acquiesced in a longstanding practice or custom which, although not the official policy of the Board, constituted a standard operating procedure of the Chicago Transit Authority.

(*Id.* at 1649.)

These instructions are an accurate statement of the law. In *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989), the Supreme Court explained that prior to submitting a case to the jury, the court must determine the identity of the official policymakers and that once the policymakers have been identified, "it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." (emphasis in original; citation omitted); *see also Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990); *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 889–90 (9th Cir.1990). The CTA does not challenge the district court's legal determination that the Board, and not Hughes, was its official policymaker. Indeed, that is precisely the position advanced by the CTA before the district court and on appeal. The CTA is therefore left to contest the jury's determination that the Board's own commands or its acquiescence in an existing practice or custom caused a deprivation of McNabola's constitutional rights.

■■■ The jury determined that the CTA had a custom or policy of terminating white *per diems* and that McNabola was terminated pursuant to that custom or policy. The CTA faces an uphill battle in challenging these fact-based findings, as our review is limited to whether the evidence was sufficient for a reasonable jury to conclude that a policy existed and that McNabola was termi-

nated pursuant to that policy. *See Holzman v. Jaymar–Ruby, Inc.*, 916 F.2d 1298, 1299 (7th Cir.1990). We consider the evidence in the light most favorable to McNabola, resolving all conflicts in his favor and granting him the benefit of all reasonable inferences. *See King v. General Elec. Co.*, 960 F.2d 617, 625 (7th Cir.1992).

Unlike other areas of the law where sufficiency challenges to jury verdicts rarely succeed, municipal entities have had some success, at least in this circuit, in overturning jury verdicts imposing liability on the basis of a municipal policy or custom. *See, e.g., Tapia*, 965 F.2d at 338–39. We take added care in considering the evidence McNabola offers to establish the alleged policy or custom of the CTA Board. McNabola all but concedes that the evidence would not support the finding of an official command of the CTA Board to terminate white *per diems* and to replace them with African–Americans. Although the Board did not have an anti-discrimination policy in effect when McNabola was terminated, it also had not officially adopted a written policy or ordinance directing the termination of white *per diems.* Even witnesses who testified for McNabola stated that they knew of no official Board policy of terminating white *per diem* employees.

In the absence of a formal policy, McNabola must rely on *Monell*'s custom or practice prong to establish a basis for municipal liability. *Monell* authorizes the imposition of liability against a municipal entity "for constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690–91, 98 S.Ct. at 2036; *see also Pembaur*, 475 U.S. at 482 n. 10, 106 S.Ct. at 1300 n. 10. We explained in *Cornfield* that "a practice of unconstitutional conduct, although lacking formal approval, may provide a basis for municipal liability" if the plaintiff can establish that the policymaking authority acquiesced in a pattern of unconstitutional conduct. 991 F.2d at 1326; *see also Felton v. Board of Commissioners*, 5

F.3d 198, 203 (7th Cir.1993). A municipal "custom" may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice. *See Fletcher v. O'Donnell*, 867 F.2d 791, 793–94 (3d Cir.), *cert. denied*, 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989). The long-standing or widespread nature of a particular practice would support the inference that policymaking officials "must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir.1991); *see also Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir.1989). Although this case is very close, we are convinced that the evidence was sufficient for a reasonable jury to conclude that the CTA Board acquiesced in a practice or custom of terminating white *per diems.* We outline that evidence below.

First, John Hoellen, a member of the CTA's Board from 1979 to 1990, testified about a procedure whereby an aggrieved employee could petition the Board for a hearing to challenge an adverse employment decision. Hoellen stated that the Board received forty-seven petitions for hearings from employees who had been removed by Hughes and that this represented a marked increase—a "crescendo," as he called it—in such petitions over previous years.[7] Indeed, Hoellen stated that the Board had held few hearings prior to 1984. Most of the petitions during Hughes' tenure came from white employees, whom Hoellen classified as "very capable people," who complained that they were victims of reverse discrimination. These employees complained to the Board that they had been harassed on the job in an effort to force them to quit, and some petitions even alleged that white employees had been placed in rooms and provided no duties. Hoellen sat as a hearing officer during part of the Hughes era, and he testified that many of the petitions were "settled," meaning that the complaining employee was restored to his former position. As a member of the CTA's Board, Hoellen was thus aware of Hughes' employment decisions, and he testified that he "deplored" her actions.

---

7. Hoellen also testified that "hundreds" of affected white employees personally complained to him because they considered him an "ombudsman" on the Board.

The jury also heard the testimony of Lorene Murray, the legal division's highest ranking woman in 1984 and 1985. Although a woman, Murray was white, and Hughes proceeded to place her on probation for the first time in her CTA career, telling Murray that she was not on Hughes' team, that Hughes "did not bring [Murray] in," and that they would revisit the issue "within 30 days to determine whether or not [Murray] would remain." Murray testified that she ultimately resigned in 1987 because working conditions had become intolerable and because she believed Hughes was attempting to drive her out because she was white. Based on her own experience as well as what she had observed with respect to new hires, promotions, and other job actions, Murray believed that Hughes was implementing a campaign to drive out white employees at the CTA.

Next, the evidence established that while Hughes was General Counsel, over seventy percent of the per diem attorneys hired were African–American, although African–Americans made up only three percent of the attorney labor pool in the Chicago area. Of course, that statistic relates only to new hires and does not itself suggest a policy of *terminating* existing white per diem attorneys. But the evidence also showed that the existing white attorneys received no new assignments and that new cases were assigned exclusively to the new African–American hires. The CTA offered a non-discriminatory justification for this important fact—that white per diem attorneys had existing cases and that it was therefore natural to assign new cases to the new hires. Yet we think the jury was entitled to reject this explanation and to infer that Hughes was implementing a policy of effectively terminating white per diem attorneys. If Hughes assigned no new cases to those attorneys, then their work for the CTA eventually would dry up. Thus, the practice of hiring an unusually high percentage of African–American per diem attorneys, when coupled with the evidence that white per diem attorneys were

provided no new cases, supports the jury's finding of a policy or practice of terminating the white attorneys.

The question then becomes whether this was Hughes' policy alone or whether it can also be attributed to the CTA Board. We find the evidence sufficient for a reasonable jury to conclude that the Board knew of Hughes' practice and failed to stop it. Indeed, the evidence established that the Board made all final decisions relating to the initial procurement and retention of per diem attorneys and physicians. Although Hughes recommended attorneys for the per diem list, her recommendations went either to the Chairman of the Board or to a Board committee, which made the final decisions. The CTA's response to an interrogatory posed by McNabola established this crucial fact. The CTA stated that although Hughes may have recommended some or all of the per diem independent contractors, "[r]ecommendation does not constitute 'hire' because all final decisions respecting the retention or procurement of the services of independent contractors by the CTA were, during Joyce A. Hughes['] tenure as General Attorney for the CTA, made by the CTA Board of Directors." (Plaintiff's Ex. 11, at 2.) Hoellen also confirmed that the Board's chairman and its Personnel Committee had to approve new additions to the per diem attorney list. (Tr. at 439.) Although the CTA elicited evidence to the effect that the Board had no involvement in day-to-day personnel decisions, that evidence related to Legal Department employees, and not per diem independent contractors. That evidence thus does not address the Board's involvement in decisions relating to the per diems. Yet, even with respect to general CTA employees, the evidence showed that the Board was aware of the inordinately large number of reverse discrimination complaints, and it did nothing to in any way limit Hughes' authority in personnel matters. The jury could reasonably conclude that the Board acquiesced in her actions.[8]

---

8. Judge Leinenweber similarly agreed that the evidence was sufficient to support the jury's finding of a policy. In denying the CTA's motion for judgment notwithstanding the verdict, he stated:

> Here the evidence tended to show that once Joyce Hughes became general attorney for the CTA and came to control the allocation of work to independent contractors such as plain-

### B. Constitutional Violation

■■■■■ The CTA contends that in addition to his failure to establish a policy or custom of the CTA Board, McNabola also failed to show that such a practice caused a deprivation of his constitutional rights. To prevail under section 1983, McNabola was required to establish that

> (1) [he] held a constiutionally protected right; (2) he was deprived of this right in violation of the Constitution; (3) the [CTA] intentionally caused this deprivation; and (4) the [CTA] acted under color of [state] law.

Sims v. Mulcahy, 902 F.2d 524, 538 (7th Cir.), cert. denied, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990); see also Patrick v. Jasper County, 901 F.2d 561, 565 (7th Cir.1990). McNabola maintained that his termination by the CTA deprived him of the right to equal protection of the laws under the fourteenth amendment. To establish a prima facie case of discrimination under the equal protection clause, McNabola was required to show that he "is a member of a protected class," that he "is otherwise similarly situated to members of the unprotected class," and that he "was treated differently from members of the unprotected class." McMillian v. Svetanoff, 878 F.2d 186, 189 (7th Cir.1989); see also Sims, 902 F.2d at 538. McNabola also was required to show that the CTA acted with discriminatory intent. Sims, 902 F.2d at 539; Webb v. City of Chester, 813 F.2d 824, 828 (7th Cir.1987). If McNabola makes out a prima facie case of discrimination, "'the burden then shifts to [the CTA] to articulate a legitimate non-discriminatory reason for taking the action alleged by plaintiff to be discriminatory.'" Sims, 902 F.2d at 539 (quoting Webb, 813 F.2d at 828). As the Supreme Court recently explained in St. Mary's Honor Ctr. v. Hicks, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993), "'the defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." (emphasis in original) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)).

■■■■■ Once the defendant succeeds in meeting this burden, "'the burden then shifts back to plaintiff to demonstrate that the proffered reason is merely a pretext for discrimination.'" Sims, 902 F.2d at 539 (quoting Webb, 813 F.2d at 828). Pretext may be shown "either directly by persuading the [jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S.Ct. at 1095; see also Smith v. BMI, Inc., 957 F.2d 462, 464 (7th Cir.1992). To establish a lack of credence, McNabola was required to show by a preponderance of the evidence either "'(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.'" Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir.1988) (quoting Kier v. Commercial Union Ins. Cos., 808 F.2d 1254, 1259 (7th Cir.), cert. denied, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987) (emphasis in Kier )); see also Jones v. Jones Bros. Constr. Corp., 879 F.2d 295, 299 (7th Cir.1989). Rejection of the proffered reasons for the discharge as pretext then "permit[s] the trier of fact to infer the ultimate fact of intentional discrimination." Hicks, —— U.S. at ——, 113 S.Ct. at 2749

---

tiff, assignments of work to whites almost ceased. Plaintiff produced other evidence of harassment or termination of CTA white professionals. In addition, John Hoellen, a member of the CTA Board, testified that after Mayor Washington placed Ms. Hughes as General Attorney of the CTA that there were considerable complaints and bad feelings on the part of white employees about discrimination. A reasonable inference can be drawn from this testimony together with the testimony of actual discrimination that the Board was well aware of a de facto policy of the CTA to favor blacks over whites and that plaintiff was a victim of this policy. Consequently, there is sufficient evidence to support the jury's special verdict that the CTA had a discriminatory policy with regard to per diem employees and that plaintiff's constitutional rights were violated as a result of such a policy.
(Sept. 11, 1991 Tr. at 5.)

(emphasis in original). The verdict here indicates the jury's belief that the offered justifications were pretextual and that McNabola's termination instead resulted from intentional discrimination.

■ Initially, the CTA maintains that because McNabola was the only *per diem* medical examiner, he necessarily could not show that he was treated differently from a similarly situated member of an unprotected class. Yet because the CTA employed only a limited number of *per diem* physicians, McNabola likened his treatment to that of *per diem* attorneys, who were used by the CTA in greater numbers. The CTA discounts any basis for comparison, however, contending that the job responsibilities of legal and medical *per diems* differ significantly. That of course is true, but it does not render the comparison inapt. The reasons for comparing *per diem* attorneys and physicians relates not to the precise task that either performs, but to the fact that both are independent contractors utilized by the CTA for their expertise as the circumstances warrant. The CTA is not insulated from liability under the equal protection clause merely because it utilizes only a limited number of *per diem* medical examiners. We thus agree with the district court that McNabola is similarly situated to the CTA's *per diem* attorneys.

■ Having accepted that premise, we have no difficulty concluding that McNabola made out a prima facie case of racial discrimination. McNabola demonstrated that he is white, that he is similarly situated to other non-white *per diems*, and that he was treated differently (*i.e.*, terminated) on account of his race. There was also ample evidence from which to infer that the CTA acted with discriminatory intent. The evidence was thus sufficient to establish that the CTA acted " 'at least in part 'because,' not merely 'in spite of' its adverse [e]ffects upon an identifiable group.' " *Sims*, 902 F.2d at 539 (quoting *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)).

■ Of course, after a trial on the merits, " 'disputes about the prima facie case fall away,' " and " '[w]e need resolve only the ultimate question of whether there was sufficient evidence for a jury to conclude that [race] was a determinative factor in [the plaintiff's] discharge.' " *Overgard v. Cambridge Book Co.*, 858 F.2d 371, 376 (7th Cir. 1988) (quoting *Kier*, 808 F.2d at 1257); *see also E.E.O.C. v. Century Broadcasting Corp.*, 957 F.2d 1446, 1455 (7th Cir.1992); *Heerdink v. Amoco Oil Co.*, 919 F.2d 1256, 1259–60 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991). At the heart of the CTA's defense were a number of nondiscriminatory justifications for McNabola's termination offered primarily through the testimony of Hughes herself, ranging from complaints from CTA employees about McNabola's examinations to unauthorized hospital visits to the use of a CTA prescription pad for a private patient. Yet McNabola responded with evidence suggesting that the proffered reasons were merely a pretext and that he actually was terminated pursuant to the custom, acquiesced in by the CTA Board, of terminating white *per diems* and replacing them with African–Americans. Indeed, McNabola cast significant doubt on the CTA's proffered reasons for his termination. For example, Hughes testified that one of the reasons she terminated McNabola was the added cost of having a third person in the examining room due to the numerous complaints that had been lodged against McNabola. Yet the jury could find this justification pretextual in that McNabola's replacement earned fifty percent more per hour than McNabola, and the CTA continued to have a third person in the examining room even under Dr. Reid. Moreover, the jury also could discount Hughes' reliance on this factor because the 1985 internal CTA audit had shown a significant reduction in worker's compensation claims under the in-house policing program that more than compensated for any added cost. The jury was thus entitled to infer that the CTA's allegedly legitimate, non-discriminatory reasons did not actually motivate McNabola's discharge but that his race was a determining factor in that event. The evidence, as the district court aptly observed, presented "a classic issue of

fact." (Sept. 11, 1991 Tr. at 4.)[9] The jury resolved that issue against the CTA, finding the CTA's reasons pretextual and concluding that intentional race discrimination was a determinative factor in the discharge. The evidence was sufficient to support those findings.

## C. Motion for Judgment Notwithstanding the Verdict

Related to its sufficiency challenges, the CTA also contends that the district court erred in denying its motion for judgment notwithstanding the verdict ("j.n.o.v."). It maintains that the motion should have been granted because there was no evidence to support the jury's conclusion that race was a determining factor in McNabola's termination or that he was terminated pursuant to a CTA policy, custom, or practice.

 We review de novo the district court's denial of a motion for judgment notwithstanding the jury's verdict. *Tapia*, 965 F.2d at 338; *Overgard*, 858 F.2d at 375. "The standard for determining whether a j.n.o.v. should be granted is whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Tapia*, 965 F.2d at 338; *see also Erwin v. County of Manitowoc*, 872 F.2d 1292, 1295 (7th Cir.1989); *Overgard*, 858 F.2d at 375. In reviewing the denial of a j.n.o.v. motion, we are obliged to review the record to ensure that sufficient evidence exists to support the verdict, but we will not otherwise consider

the weight of the evidence, nor will we re-evaluate the credibility of witnesses. *Tapia*, 965 F.2d at 338; *Overgard*, 858 F.2d at 375. A motion for judgment notwithstanding the jury's verdict should be granted only when there can be but one conclusion from the evidence. *Chambers v. Maher*, 915 F.2d 1141, 1143 (7th Cir.1990), *cert. denied*, 499 U.S. 910, 111 S.Ct. 1116, 113 L.Ed.2d 225 (1991).

 Our discussion of the CTA's sufficiency challenges shows that there was not but one conclusion that could be drawn from the evidence here. Instead, factual issues abound in the trial record. Considering the evidence in the light most favorable to McNabola and granting him the benefit of all reasonable inferences, we agree with the district court that sufficient evidence exists to support the jury's verdict. Denial of the CTA's motion for judgment notwithstanding the verdict was therefore required.

## D. Motion for a New Trial

### 1. Damages

The CTA also requested that the district court order a new trial on the ground that the jury's damage award was excessive. The jury originally awarded McNabola $379,-415.66, which was comprised of $286,084.90 in past lost wages, $78,330.76 in future lost wages, and $15,000 in mental distress. The district court agreed that the verdict was excessive, and it ordered a remittitur of $112,658.85, reducing the jury's verdict by thirty-one percent—to $265,756.81.[10] Even

9. In denying the CTA's post-trial motion, the district court stated:

There is plenty of evidence, when viewed most favorably for the plaintiff, that his services as an independent contractor for the CTA were terminated because of his race (white). He established that he was meeting the legitimate expectations of his employer, he was terminated and was replaced by a black. ... The CTA came up with multiple alleged non-discriminatory reasons including that its employees incessantly complained about the plaintiff's medical examinations, hospitals complained about unauthorized visits, he sexually molested female employees, and he was investigated by the Illinois Department of Registration and Education. Arrayed against this

was his denial of misconduct, testimony extolling his work by his direct superiors, the inferior record of his successor and other evidence. (*Id.* at 3–4.)

10. The remittitur resulted from the district court's finding that the jury had awarded a gross income figure for past and future lost wages that had not accounted for McNabola's expenses. The district court therefore thought it "clear that the gross earnings must be reduced by the amount of expenses supported by the record, that is, somewhere between 22 percent and 40 percent. A reasonable figure is 31 percent, midway between high and low." (Sept. 11, 1991 Tr. at 7.) The court appropriately provided McNabola the option either of accepting the remittitur or receiving a new trial on damages. *See Halusc-*

after the remittitur, however, the CTA still maintains that the award was excessive and that it was entitled to a new trial on damages.

Because the district court has broad discretion in determining whether or not to grant a new trial, we review the denial of such a motion only for a clear abuse of discretion. *Tapia,* 965 F.2d at 338; *Cygnar v. City of Chicago,* 865 F.2d 827, 835 (7th Cir.1989). The district court must consider "if the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Tapia,* 965 F.2d at 338; *see also Allison v. Ticor Title Ins. Co.,* 979 F.2d 1187, 1196 (7th Cir.1992). When the motion is based primarily on the excessive nature of the damages, the jury's award may be vacated and a new trial granted only if the verdict "is 'monstrously excessive' or if there is 'no rational connection between the evidence on damages and the verdict.'" *Tragarz v. Keene Corp.,* 980 F.2d 411, 430 (7th Cir.1992) (quoting *Joan W. v. City of Chicago,* 771 F.2d 1020, 1023 (7th Cir.1985)); *see also Cygnar,* 865 F.2d at 847. We thus review the damages evidence in the light most favorable to the jury's verdict, and the verdict must stand unless there is no rational connection between the evidence and the jury's award. *Mercado v. Ahmed,* 974 F.2d 863, 866 (7th Cir.1992); *Lippo v. Mobil Oil Corp.,* 776 F.2d 706, 716 (7th Cir.1985). The same standards apply where the district court has remitted a portion of the jury's award and the defendant claims that the remitted award is still excessive. *Cf. Superbird Farms, Inc. v. Perdue Farms, Inc.,* 970 F.2d 238, 247 (7th Cir.1992). We must thus determine whether there is a rational connection between the evidence and the remitted award.

The CTA first maintains that as a *per diem* independent contractor, McNabola was entitled only to contract and not tort damages. It thus argues that McNabola may recover only lost profits resulting directly from his termination, rather than past and future lost wages. Because McNabola was able to mitigate his contractual damages through other income in subsequent years, the CTA argues that he suffered no lost profits and that the maximum level of his damages is therefore limited to the $15,000 for mental distress. The CTA contends that the jury's award of past and future lost wages essentially put McNabola in a better position than he would have been in had the independent contractor relationship with the CTA continued.

The fallacy in the CTA's argument is that contract damages, meaning lost profits occasioned by the alleged breach of contract, are proper in a section 1983 action for employment discrimination. McNabola's case was not based on the theory that the CTA had breached an employment contract. Indeed, the CTA itself contends that McNabola was an at will employee who could be terminated at any time. Instead of alleging a contract claim, McNabola maintained that he was improperly terminated under section 1983 on account of his race in violation of the equal protection clause. He thus alleged a constitutional tort rather than a contract claim, as section 1983 is a tort statute (*Jones v. Hamelman,* 869 F.2d 1023, 1031 (7th Cir. 1989); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982)) permitting compensation for the "impairments and wounds to the rights and dignities of the individual." *Baker v. Board of Regents,* 991 F.2d 628, 631 (10th Cir.1993); *see also Wilson v. Garcia,* 471 U.S. 261, 277, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985) ("Congress unquestionably would have considered the remedies established in the Civil Rights Act to be more analogous to tort claims for personal injury than, for example, to claims for damages to property or breach of contract."); *Donald v. Polk County,* 836 F.2d 376, 380 (7th Cir.1988) ("suits under section 1983 are tort damage actions"). Injuries compensable under section 1983 are regarded as personal injuries (*see Wilson,* 471 U.S. at 278, 105 S.Ct. at 1948; *Gray v. Lacke,* 885 F.2d 399, 407 (7th Cir.1989), *cert.*

hak v. Dodge City of Wauwatosa, Inc., 909 F.2d 254, 256 (7th Cir.1990). McNabola accepted the remittitur, and the district court entered judgment for the reduced amount.

McNabola maintains that the remittitur was in error, but he concedes that he cannot challenge it on appeal because he accepted the remittitur below.

*denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990)), and in a case such as this, where no breach of contract has even been alleged, McNabola's injuries are personal and are not necessarily limited to contractual lost profits.

 We find support in the record for the remitted damage award. McNabola's damage theory was premised on the notion that he would still have generated other income had he continued to handle claims for the CTA. The evidence established that McNabola worked more than one job at any one time, and sometimes as many as three or four. Indeed, for all but his last ten months with the CTA, McNabola also held a full-time salaried position with the City of Chicago. He retired from that position in 1986, thereby freeing up approximately thirty-five hours per week for consulting and independent contracting work at an hourly rate in excess of that he earned while working for the City. His higher income in the years following his termination is thus attributable to the fact that he did consulting work at this higher hourly rate.

McNabola maintained that, in addition to his consulting work, he still would have had the time to continue his work for the CTA and that he therefore is entitled to his lost wages despite his other income. That is a credible assertion given that McNabola had worked a full-time job with the City during part of his time with the CTA. McNabola's damages expert operated from the premise that McNabola could both continue his work for the CTA and generate other income from independent sources, and he thus calculated McNabola's past and future lost wages with the CTA to be $364,415.66. That is the amount the jury awarded. The district court subsequently reduced that award to account for McNabola's business expenses, but beyond that, the court stated:

> It is clear that the jury did not credit the CTA with any mitigation based on plaintiff's other earnings in similar type work in the years between the violation and the trial. However, plaintiff did testify that he would have done all of the work that he did do in addition to his CTA work. While this testimony is suspect it is not worthy of

disbelief. Obviously, the jury chose to believe him.

(Sept. 11, 1991 Tr. at 7.) Given the evidence of McNabola's ability to hold a number of jobs at any one time, we are even less skeptical of McNabola's testimony than was the district court. We think there was sufficient evidence of McNabola's ability to do both his CTA and other work to support the jury's belief. There is thus a rational connection between the remitted damage award and the evidence, and the award does not strike us as "monstrously excessive." A new trial was not warranted on the issue of damages.

### 2. Evidentiary Rulings

 The CTA also contends that several evidentiary rulings deprived it of a fair trial. First, it challenges the exclusion of two documents relating to CTA employee Carlton Pradd. The first was an arbitration decision granting Pradd a judgment against the CTA, and the second was Pradd's medical malpractice complaint against McNabola. Pradd had suffered an injury while working for the CTA, and following an examination by McNabola, he was taken by ambulance to a local hospital. Pradd won an arbitration judgment against the CTA when a CTA attorney failed to appear for a hearing. Before McNabola's termination, the CTA's investigators videotaped Pradd roller-skating at a time when he was on leave due to his injury. The district court excluded these exhibits on two grounds. First, the CTA had failed to produce them during discovery. Apart from that, the district court also found the documents irrelevant because the arbitration judgment did not exist at the time of McNabola's termination, and Hughes had never suggested that she saw or relied on Pradd's medical malpractice complaint in reaching her decision. (Tr. at 17–19.) The district court also advised the CTA that it could "relitigate the issue" as the evidence came in at trial (*id.* at 18), but the CTA never attempted to do so. We find no abuse of discretion in the district court's alternative rulings.

The district court also excluded three documents relating to the CTA's policy on anti-discrimination and affirmative action. Ex-

hibit 34 was the policy statement itself; Exhibit 35 was a Board ordinance relating to the policy; and Exhibit 36 was a memo from the CTA's personnel director on the issue of non-discrimination. The CTA withheld these documents during discovery on the ground that McNabola was an independent contractor and not a CTA employee, meaning that the policies would not apply to him. Yet it switched horses in midstream and attempted to use the documents at trial to rebut McNabola's policy claim. The district court refused to countenance the flip-flop, explaining that the CTA could not "take a position in discovery on one thing and then change [its] view at the time of trial." (Tr. at 27.) That is clearly not an abuse of the court's discretion. Moreover, even if the CTA had complied with its discovery obligations, the documents also were excludable because they were not in existence when McNabola was terminated. They were thus not relevant to the CTA's policy at that time.

We have similarly reviewed all of the CTA's other evidentiary challenges, and we find nothing that deprived it of a fair trial. The CTA's motion for a new trial was properly denied.

### E. Attorney's Fees and Costs

The CTA maintains that the district court also abused its discretion in awarding McNabola $184,653.00 in attorney's fees pursuant to 42 U.S.C. § 1988. The district court settled on this award after reducing the amount requested in McNabola's fee petition by approximately $15,000 due to the vagueness of the billing statements in documenting conferences between McNabola's attorneys. The court also denied McNabola's request for a multiplier. The CTA's primary objections to the fee award are to counsel's billing rates, the district court's finding that there was not an unreasonable duplication of effort amongst the attorneys, and McNabola's alleged failure to produce the contingency fee agreement and copies of client bills. The CTA requests that we either deny any award of attorney's fees or reduce the district court's award by fifty percent. We have determined to do neither.

Section 1988 permits the award of a reasonable attorney's fee to the prevailing party in the discretion of the district court. Because such an award generally is fact-based, we review it under the "highly deferential abuse of discretion standard." *Leffler v. Meer*, 936 F.2d 981, 984 (7th Cir. 1991); *see also Eddleman v. Switchcraft, Inc.*, 965 F.2d 422, 424 (7th Cir.1992); *Carston v. County of Cook*, 962 F.2d 749, 753 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 974, 122 L.Ed.2d 128 (1993). A decision on a fee award is "left to the discretion of the district court in light of its 'superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.' " *Leffler*, 936 F.2d at 984–85 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)). A district court does not abuse its discretion in awarding fees if reasonable persons could differ over the view it adopts. *Leffler*, 936 F.2d at 984; *Nanetti v. University of Illinois*, 867 F.2d 990, 995 (7th Cir.1989).

The starting point for calculating a reasonable attorney's fee under section 1988 is the "lodestar," which refers to the base figure arrived at by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Leffler*, 936 F.2d at 985 (citing *City of Riverside v. Rivera*, 477 U.S. 561, 568, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986); *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939). The party requesting fees has the burden of substantiating the reasonableness of the hours expended and the hourly rate. *Estate of Borst v. O'Brien*, 979 F.2d 511, 515 (7th Cir.1992). The lodestar may then be adjusted by reference to the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), which have been approved and adopted by the Supreme Court. *See Blanchard v. Bergeron*, 489 U.S. 87, 91 & n. 5, 109 S.Ct. 939, 943 & n. 5, 103 L.Ed.2d 67 (1989); *Riverside*, 477 U.S. at 568 & n. 3, 106 S.Ct. at 2691 & n. 3. We explained in *Leffler* that although a district court has wide latitude in calculating an appropriate fee award, "if the requested hourly rate or number of hours is reduced, a clear explanation must be provided." 936 F.2d at

985; *see also Estate of Borst,* 979 F.2d at 515–16.

■ The CTA's first challenge is to the hourly rates allowed by the district court. The reasonable hourly rate used in calculating the lodestar must be based on the market rate for the attorney's work. *Eddleman,* 965 F.2d at 424; *Leffler,* 936 F.2d at 985; *see also Pressley v. Haeger,* 977 F.2d 295, 299 (7th Cir.1992) ("Prevailing plaintiffs are entitled not to a 'just' or 'fair' price for legal service, but to the *market* price for legal services"). "The market rate is 'the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question.'" *Eddleman,* 965 F.2d at 424 (quoting *Henry v. Webermeier,* 738 F.2d 188, 193 (7th Cir. 1984)). Here, the district court found that rates of $210 for lead counsel, $150 for other counsel, and $100 for the most junior member of the litigation team were "high" but within the market range of attorneys with similar experience in similar litigation. (Dec. 18, 1991 Tr. at 3.) The requested rates were supported by affidavits of other attorneys in the area attesting to the experience of McNabola's attorneys and to the reasonableness of their rates for this type of civil rights litigation. The CTA did not contest McNabola's affidavits other than to suggest that the $210 rate for lead counsel exceeded that permitted in the cases on which McNabola relied. Yet that is not indicative of prevailing market rates at the time of the district court's fee award. All the evidence of record suggested that $210 was the prevailing market rate, and the district court therefore did not abuse its discretion in utilizing that rate in calculating the lodestar. *See Pressley,* 977 F.2d at 299.

As to the vague or duplicative nature of some of the billing entries, we also perceive no abuse of the district court's discretion in finding that the attorney diaries were "generally complete and detailed," that the work was "efficiently performed," and that "there is no evidence of unreasonable duplication of efforts." (Dec. 18, 1991 Tr. at 3–4.) The court nonetheless deducted over fifty hours from the diaries of various attorneys for conferences that were not sufficiently explained.

The district court provided a reasoned explanation for making this reduction and for refusing any further reduction. By virtue of its familiarity with the litigation, the district court certainly is in a better position than we to determine the number of hours that were reasonably expended. *See Eddleman,* 965 F.2d at 425 n. 1; *Carston,* 962 F.2d at 754.

The CTA next argues that the fee award should be vacated because McNabola violated a district court order by refusing to produce the contingency fee agreement and certain client bills. We are somewhat mystified by this contention, as we have located no instance in the record (and the CTA has cited none) where the CTA complained to the district court that McNabola had failed to comply with its order. Perhaps the matter was not raised below because the CTA failed to appear at the December 18, 1991 hearing at which the district court awarded fees. (*See* Dec. 18, 1991 Tr. at 1.) In any event, it is waived.

The CTA also contests the district court's award of $13,630.79 in costs, contending that certain of the costs are not recoverable. "The award of costs 'is the type of discretionary ruling to which appellate courts should give 'virtually complete' deference.'" *Estate of Borst,* 979 F.2d at 517 (quoting *Hudson v. Nabisco Brands, Inc.,* 758 F.2d 1237, 1244 (7th Cir.1985)). We have reviewed the CTA's objections to the award of costs and find no abuse of the district court's discretion.

## F. Prejudgment Interest

Finally, the CTA contends that the district court erred in awarding prejudgment interest of $20,438.55 on McNabola's back pay award. The CTA maintains that the district court lacked jurisdiction to make such an award because McNabola did not serve his motion for prejudgment interest within ten days of entry of the judgment, as Fed. R.Civ.P. 59(e) requires. McNabola responds that the CTA had filed a timely post-trial motion and that the finality of the district court's judgment was therefore suspended for all purposes, meaning the court had jurisdiction to consider his request. McNabola alternatively argues that even if his motion

was untimely as to the first judgment, it was served within ten days of the amended judgment entered after McNabola had accepted the court-ordered remittitur.

■. In *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175, 109 S.Ct. 987, 991, 103 L.Ed.2d 146 (1989), the Supreme Court held that a motion for prejudgment interest filed after entry of a final judgment is a motion to alter or amend the judgment under Rule 59(e). The Court reasoned that prejudgment interest " 'is an element of [plaintiff's] complete compensation' " and that it is therefore "intertwined in a significant way with the merits of the plaintiff's primary case as well as the extent of his damages." *Id.* at 175, 176, 109 S.Ct. at 991, 992 (quoting *West Virginia v. United States*, 479 U.S. 305, 310 & n. 2, 107 S.Ct. 702, 706 & n. 2, 93 L.Ed.2d 639 (1987)); *see also Lorenzen v. Employees Retirement Plan of the Sperry and Hutchinson Co.*, 896 F.2d 228, 231 (7th Cir.1990). A timely motion for prejudgment interest under Rule 59(e) suspends the finality of the judgment and renders a nullity any notice of appeal filed prior to its resolution. *Osterneck,* ·489 U.S. at 177, 109 S.Ct. at 992; *see also* Fed.R.App.P. 4(a)(4). Yet, because a motion for prejudgment interest is considered a Rule 59(e) motion, it is subject to that rule's timing requirement—that it be served "no later than 10 days after entry of the judgment"—and the district court is not empowered to extend the ten-day period. *See Winston Network, Inc. v. Indiana Harbor Belt R.R. Co.*, 944 F.2d 1351, 1362 (7th Cir. 1991); *Charles v. Daley*, 799 F.2d 343, 347 (7th Cir.1986); Fed.R.Civ.P. 6(b). McNabola's motion for prejudgment interest was not served within ten days of entry of the March 4, 1991 judgment but was served only on July 29, 1991. (R. 173.) The motion was thus untimely, and the district court had no jurisdiction to consider it.

■ McNabola nonetheless argues that the district court had jurisdiction because *the CTA had filed a timely postjudgment motion.* We agree that the district court retained jurisdiction *over the case,* but that does not necessarily mean that it had jurisdiction to award prejudgment interest. McNabola's motion for prejudgment interest requested that the court alter the judgment in a way that was unrelated to the CTA's postjudgment motion. *Cf. Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1155 (9th Cir.1988) (motion for modification of relief was timely because it was filed as a court-ordered response to federal defendants' timely Rule 59(e) motion, and was not itself a Rule 59(e) motion). Although a timely postjudgment motion opens up the earlier judgment and even permits the court to enlarge on the issues delineated by the motion (*see Charles,* 799 F.2d at 347; *see also Varley v. Tampax, Inc.,* 855 F.2d 696, 699 (10th Cir. 1988); *United States v. Hollis,* 424 F.2d 188, 191 (4th Cir.1970)), the non-moving party may not then make its own untimely request for alteration of the judgment on a wholly independent ground. *Cf. Sun–Tek Indus., Inc. v. Kennedy Sky Lites, Inc.,* 848 F.2d 179, 181–82 (Fed.Cir.1988) (rejecting argument that a timely post-trial motion opened up entire judgment, including issues that had not been challenged by the motion), *cert. denied,* 488 U.S. 1009, 109 S.Ct. 793, 102 L.Ed.2d 784 (1989); *Hidle v. Geneva County Bd. of Educ.,* 792 F.2d 1098, 1100 (11th Cir. 1986) (district court abused its discretion when, in response to the plaintiff's Rule 59(e) motion, it set aside the judgment in the plaintiff's favor and entered judgment for a defendant who had not filed a timely postjudgment motion), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987). McNabola's request for prejudgment interest was not filed in response to the CTA's postjudgment motion; indeed, McNabola's response to that motion made no mention of prejudgment interest. (R. 170.) McNabola only moved for prejudgment interest at approximately the same time he requested attorney's fees and costs, apparently presuming that prejudgment interest also is considered collateral to the underlying judgment. But *Osterneck* holds otherwise, distinguishing prejudgment interest from attorney's fees and costs. 489 U.S. at 175, 109 S.Ct. at 991. Unlike a motion for attorney's fees and costs, a motion for prejudgment interest is subject to Rule 59(e)'s ten-day service requirement.

McNabola attempts to salvage his prejudgment interest award by contending that the district court entered a second final judgment on December 10, 1991, when McNabola accepted the court-ordered remittitur, and that his motion was therefore a timely Rule 59(e) motion in regards to that final judgment. McNabola relies on our statement in *Charles* that a "significant change in a judgment starts all time periods anew," because "the altered judgment is a 'new judgment' with new periods of time." 799 F.2d at 348 (citing *FTC v. Minneapolis–Honeywell Regulator Co.*, 344 U.S. 206, 211, 73 S.Ct. 245, 248, 97 L.Ed. 245 (1952)). We perceive several problems with McNabola's alternative theory.

First, the facts here do not support it because McNabola did not file a motion for prejudgment interest subsequent to the entry of any "second final judgment." Rather, the motion itself was served in July 1991, and the court simply did not resolve the matter until after McNabola had accepted the remittitur. Moreover, the December 10, 1991 order, which McNabola terms a "second final judgment," was not "final" at all because the order itself states that McNabola had accepted the remittitur and that prejudgment interest and attorney's fees were still outstanding. (R. 210.)

But McNabola's alternative theory also fails for a more fundamental reason: the second Rule 59(e) motion contemplated in *Charles* must bear some relationship to the district court's alteration of the first judgment—that is, the motion must challenge the altered and not the original judgment. We explained in *Charles* that:

> The time limit would be a joke if parties could continually file new motions, preventing the judgment from becoming final. The 10 days runs from the initial judgment, so later motions are not timely. Yet the purpose of Rule 59 is to allow the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings. The purpose of the rule suggests that when a court *alters* its judgment, *a person aggrieved by the alteration may ask for correction.*

799 F.2d at 348 (citation omitted; emphasis added); *see also Winston Network*, 944 F.2d at 1362 ("In order to be timely, a rule 59(e) motion must be filed 'not later than 10 days after entry of the judgment' it seeks to alter or amend."); *Branion v. Gramly*, 855 F.2d 1256, 1259 (7th Cir.1988) ("If a judge alters her judgment in response to the first motion, the party aggrieved by the change may file a motion directed to the difference"), *cert. denied*, 490 U.S. 1008, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989). In *Charles*, the party who filed the second motion had been aggrieved by the amended judgment because the court had added it as a party responsible for the attorney's fee award. That alteration "was enough to make the judgment a new one, affording aggrieved parties time to seek alteration or to appeal." *Charles*, 799 F.2d at 348. Here, although McNabola arguably was aggrieved by an amended judgment that lowered his damage award, his motion for prejudgment interest did not address that harm. *See Winston Network*, 944 F.2d at 1362; *cf. Harrell v. Dixon Bay Transp. Co.*, 718 F.2d 123, 127 (5th Cir.1983). Although McNabola could have filed a Rule 59(e) motion *challenging the remittitur* after entry of a "second final judgment" (*see Wright v. Preferred Research, Inc.*, 891 F.2d 886, 889–90 (11th Cir.1990) (motion to reconsider order of remittitur is valid Rule 59(e) motion because it challenges for the first time the basis for a new, reduced judgment)), he could not for the first time file a motion for prejudgment interest because such a motion was addressed to the initial and not the amended judgment. The motion for prejudgment interest was untimely, and we therefore vacate the district court's award.

## III. CONCLUSION

Because we find sufficient evidence to support the jury's conclusion that the CTA had a custom or policy of terminating white *per diems* and that McNabola was terminated pursuant to that policy, we affirm the district court's judgment reflecting that verdict. The CTA was not entitled to a new trial on the ground that the remitted damage award was excessive or that the district court's evidentiary rulings denied it a fair trial. We

similarly affirm the district court's award of attorney's fees and costs. However, because McNabola's motion for prejudgment interest was untimely, we vacate that award.

AFFIRMED IN PART, VACATED IN PART.