Robert O'CONNOR, Plaintiff,

v.

The CHICAGO TRANSIT AUTHORITY, Walter H. Clark, Robert E. Paaswell, Joyce Hughes, Melvin May, Howard Medley; both individually and officially, Defendants.

No. 87 C 2444.

United States District Court, N.D. Illinois, E.D.

Nov. 13, 1991.

Richard Carl Leng, Leng, Stowell & Friedman, Chicago, Ill., for plaintiff.

Barry S. Alberts, Roger Pascal, Lisa A. Weiland, Catherine Masters Epstein, Schiff, Hardin & Waite, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

This case involves an employment discrimination dispute between the Chicago

Transit Authority ("CTA") and a former employee. On March 12, 1987, Robert O'Connor ("O'Connor") filed suit against the CTA and several of its officials under 42 U.S.C. § 1983 for violating his first amendment rights and denying him the equal protection of the law. After much wrangling that included the filing of three amended complaints, extensive discovery, a substitution of plaintiff's attorney, John Gubbins, mid-way through the case, protracted and intensive settlement conferences, and the defendants' withdrawal of their original motions, the defendants filed the instant motion for summary judgment in opposition to O'Connor's most recent amended complaint. For the following reasons, the motion will be granted.

## II.  FACTS AND PROCEDURAL BACKGROUND

From 1961 until 1981, O'Connor worked as a Chicago police officer. In 1981, O'Connor, who had ties to the administration of then Chicago Mayor Jane Byrne ("Mayor Byrne"), was hired as the Manager of Labor Relations at the CTA. At that time, Mayor Byrne appointees such as Board Chairman Michael Cardilli (Chairman Cardilli) controlled the seven-member CTA Board. O'Connor continued in this job until April 1984, when, in a lateral move, he was named the Manager of Police Liaison at the CTA. In this job, he investigated bribery of CTA officials, misapplication of CTA funds, improper hiring practices, illegal disclosures of information, and cover-ups of illegal acts. He also served as a liaison with federal, state, and local law enforcement agencies and reported directly to the Executive Director of the CTA.

By 1983, Harold Washington ("Mayor Washington") had been elected mayor, but it was not until 1986 that he was able to name enough Board members, such as Board Chairman Walter Clark ("Clark") and Howard Medley ("Medley"), to control the CTA Board. With the new Board came a new philosophy about hiring minorities. Up until that time, caucasians filled the vast majority of upper level positions at the CTA. Now, the CTA began an aggressive program to increase the number of minorities employed in those positions.

To this end, Mayor Washington appointed Joyce Hughes ("Hughes") to be head of the Law Department. Hughes had been a law professor at Northwestern University and had published on the subject of affirmative action. In her new job, Hughes not only supervised legal work at the CTA but also advised the Board and the Executive Director. In November 1986, Mayor Washington had Robert Paaswell ("Paaswell") installed as the Executive Director of the CTA. Paaswell was responsible for day-to-day operations at the CTA and reported directly to the Board.

Soon after Paaswell arrived at the CTA, O'Connor and Jon Roth ("Roth"), the Director of the CTA handicapped rider program, contacted him separately about irregularities in the performance of a contract the CTA had with Art's Transportation ("Art's"), a bus company that provided service to handicapped riders. Art's was owned by Art Smith, a major contributor to Mayor Washington who also had connections at the CTA with Ernest Sawyer ("Sawyer"), brother of Chicago Alderman and future mayor, Eugene Sawyer. Sawyer, a deputy executive director, oversaw the Art's contract and supervised Roth. Roth's audit of Art's records revealed that the company had fraudulently billed the CTA for work it had not provided and was paying a salary to five CTA employees, including Sawyer's mother-in-law Ruth Kocher, in violation of CTA policy. In addition, Roth informed Paaswell that an Art's official had attempted to bribe him.

After reporting this information to Paaswell, Roth was "taken to the woodshed" by Sawyer for writing this report. (Plaintiff's Exhibit 37 at 253–54, 259–60). Sawyer cited a concern with the potential for leaks to the press. Sawyer also told Roth that he would not get ahead at the CTA by such acts. By January 9, 1987, the story had in fact been leaked to the press and received fairly extensive coverage. Under public pressure, Sawyer imposed contract sanctions against Art's. One week later, he

removed Roth from his position as head of the CTA handicapped rider program.

O'Connor was also part of another investigation into corruption after Paaswell became executive director. In late 1986 and early 1987, O'Connor and Peter Zelkovich ("Zelkovich") conducted an investigation into the performance of a $38 million contract between the CTA and a fuel supplier, Metropolitan Petroleum Company ("Metropolitan"). Zelkovich was the Manager of Internal Auditing at the time. His audit revealed that Metropolitan's invoices were being delayed so that the CTA would not receive a discount under the contract. (Plaintiff's Exhibit 53). The audit also showed that Metropolitan had lied about using a minority sub-contractor, as required by the contract, and was supplying the CTA with substandard fuel. After this report was given to the Board, several Board members spoke out publicly to defend Metropolitan, including Medley and Chairman Clark. Clark also reprimanded Zelkovich in writing for this audit. Medley and several CTA employees were subsequently tried and convicted of accepting bribes from Metropolitan in order to influence the Board and discredit the audit report.

O'Connor was a part of other investigations during Paaswell's tenure. For instance, he investigated actions by CTA management involving unusual hiring practices. O'Connor noted that after Paaswell became Director in late 1986, race began to play a major role in hiring senior-level staff at the CTA. O'Connor's Department was no longer asked to perform background checks of new CTA employees as it had done previously. For example, one of Hughes' Law Department hirees, Jerome Butler, was not investigated. Another attorney hired during this period was later found to be practicing without a law license. (Plaintiff's Exhibit 42 at 17). The background checks were subsequently reinstated.

Although O'Connor had promised Paaswell that he would investigate the Art's investigation further, on February 27, 1987, Paaswell instructed O'Connor to turn over his files concerning the investigation to the Law Department. On that same day, Paaswell suspended O'Connor with pay for ten days. The suspension was needed, according to Paaswell, to investigate whether O'Connor had hired, without proper authorization, CTA security dispatchers to work with police officers patrolling buses and trains, and whether he had hired a parking lot attendant in 1986 under the same circumstances. (Defendant's Exhibit 21 and 24). While on suspension, some of O'Connor's investigative files were removed from his office, and his mail was opened.

After the suspension, O'Connor filed this suit in district court claiming that he was suspended because of his race, his political affiliation with former Mayor Byrne, and his investigations. (Defendant's Exhibit 4). In response to the suspension charges, O'Connor claimed that his supervisor, Larry Pianto, had authorized the hiring of the dispatchers and that Paaswell and Hughes had been advised of the situation. (Plaintiff's Exhibit 24). He contended that he hired the summer parking lot attendant with the authority of then Chairman Cardilli. On April 6, Paaswell sent O'Connor a written reprimand warning him to comply with the CTA's hiring procedures in the future.

At about the same time as the suspension, Paaswell began to reorganize his administrative offices. As a part of the reorganization, Paaswell combined O'Connor's Police Liaison Department with the Industrial Safety Department. In doing so, Paaswell created a new position, Manager, Industrial Safety/Police Liaison, to oversee both Departments. He considered O'Connor for the job but chose not to hire him based on what he knew about O'Connor and O'Connor's job performance evaluations. (Defendant's Exhibit 35 and 36). The job went instead to Melvin May ("May"), an African–American who had a Ph.D. from Northwestern University and who had worked as a director of security at Cook County Hospital. May started working at the CTA on April 6, 1987.

Under the reorganization, O'Connor's old job was eliminated, and he was offered a demotion to a new position, the Director of Investigations. Although he received the same salary, the new job had a lower pay grade than his prior job. O'Connor accepted the new position under protest. (Plaintiff's Exhibit 23). The position was supposed to include continued investigations into possible corruption at the CTA and continued contact with outside law enforcement agencies, but in fact O'Connor's duties changed drastically. For example, he was now made responsible for monitoring employee sign-in sheets, investigating the cost of employee name tags, compiling statistical highlights from statistical reports, and assembling information on rapid transit crimes for a graduate student who was writing a paper. (Plaintiff's Exhibit 45 at 1197, 1199, 1201). His investigative duties were greatly reduced to include only routine background checks on new employees.

In an early memo, O'Connor extended to May his cooperation and noted that their relationship had been remarkably positive up to that time given the circumstances. (Plaintiff's Exhibit 23). By the end of May 1987, however, O'Connor had complained about May to Ben Garrett ("Garrett"), the Deputy Executive Director for Human Resources. In a June 25, 1987 memo sent to Garrett and May, O'Connor complained that May had emasculated the duties of the Director of Investigations. (Defendant's Exhibit 38). Despite the job description, O'Connor noted he had no connection with investigations and had no contact with outside law enforcement agencies. O'Connor also stated that May was harassing him with threats of suspension. O'Connor denied May's criticism that he had not implemented a sign-in sheet on the 18th floor, stating that May had a "QUEEG–LIKE OBSESSION OVER THESE FORMS." O'Connor also accused May of interfering with his attempts to receive information from personnel regarding his payroll and vacation. O'Connor stated that "the situation ... has deteriorated to the extent that [May and O'Connor], along with almost all of the personnel of the Police Liaison Department, have been affected adversely in our work." *Id.*

Sometime in May or June, O'Connor contacted the Federal Bureau of Investigation ("F.B.I.") regarding the possibility of a cover-up of the Art's investigation. On June 26, May ordered O'Connor to make an "emergency move" from his office on the 18th floor to the 4th floor, where May had his office, purportedly so that "key administrative staff members [may] be brought within close proximity." (Plaintiff's Exhibit 31). O'Connor's secretary and files, as well as the eight employees that he supervised, continued to be on the 18th floor. The 4th floor office was a "cubby hole" with no windows. At first, O'Connor refused to move because the new office had no working telephone. O'Connor finally moved into the 4th floor office on July 13 after staying in the 18th floor office for about two weeks in order to comply with a discovery request from CTA attorneys for documents relating to his lawsuit against the CTA. (Defendant's Exhibit 41).

On July 20, 1987, May and Paaswell placed O'Connor on one month's probation for refusing to move into the new office. (Defendant's Exhibit 42). He was also criticized for failing to complete assignments such as weekly status reports, to provide an outline of his secretary's duties and to file his resume with May. May warned him about failing to follow instructions and disrespecting supervisory personnel in the future. O'Connor responded to the allegations point by point in a memo to Paaswell. (Defendant's Exhibit 40). In refusing May's request for his resume, O'Connor stated, "I'm not asking *him* for a promotion or anything else.... What limited credentials I have are bonafide (sic). If he wants to take a competitive intelligence exam, I'll pay for both our tests." *Id.*

On September 9, 1987, Paaswell contacted O'Connor about handling an investigation into CTA vehicle maintenance facilities at the Skokie Shops concerning the ordering of unnecessary parts. Paaswell stated that O'Connor should report directly to him and that he would advise May that O'Connor was on special assignment. (Plaintiff's

Exhibit 11). At the same time, O'Connor had been refusing to respond to May's correspondence. (Defendant's Exhibit 43). May noted to Paaswell that this arrangement made "monitoring [O'Connor's] accountability extremely difficult," and "so long as there are *any* special assignments which Robert O'Connor is assigned which circumvent my authority, ... it will be virtually impossible for me to provide direction to him." (Plaintiff's Exhibit 50 (emphasis in original)).

O'Connor thereafter refused to report to May, and May sought clarification on O'Connor's status from Paaswell. On October 9, Paaswell ordered O'Connor to turn over all of his investigative files to the Law Department. Three weeks later, Paaswell wrote to O'Connor that even when he was on special assignment, he still had to report to May regarding his activities. (Plaintiff's Exhibit 51). Paaswell also stated that all future investigations should be coordinated with the Law Department.

On October 26, May requested that O'Connor provide him with his work schedule. O'Connor responded by writing on the bottom of the memo, "No! No!" (Defendant's Exhibit 46). On October 28, 1987, May completed a performance appraisal of O'Connor, but O'Connor refused to review the report with May. (Defendant's Exhibit 45).

On November 3, 1987, O'Connor contacted federal officials concerning the Skokie Shops investigation, and the F.B.I. opened an investigation with his help. O'Connor also wrote to Paaswell that he had gone to the F.B.I. and that he thought a cover-up was in the works. (Plaintiff's Exhibit 4). The next day, May wrote to O'Connor, ordering him to move back into his 4th floor office because recently O'Connor had migrated back up to the 18th floor. O'Connor responded by memo that "[i]f the impetus behind this senseless, public-fund wasting, counter-productive, petulant suggestion is yours, then put it aside and don't embarrass yourself further by pushing it." (Defendants Exhibit 44). On November 5, Paaswell wrote to O'Connor relieving him of all responsibility for the Skokie Shops investigation, but encouraging him to continue cooperating with the Office of the Inspector General, U.S. Department of Transportation in its investigation. (Plaintiff's Exhibit 5). O'Connor did this.

Finally, on November 13, 1987, Paaswell signed a notice terminating O'Connor's employment at the CTA. (Defendant's Exhibit 47). The reasons given were insubordination, poor work performance, absence from the assigned work location, and disrespect for supervisory personnel. After O'Connor's firing, Zelkovich, who had been responsible for the Metropolitan audit, was demoted to fill O'Connor's old position and given O'Connor's old 4th floor office. (Plaintiff's Exhibit 53). Zelkovich was later assigned to the Workers' Compensation Department.

On January 25, 1991, O'Connor filed his third amended complaint under § 1983, alleging that defendants deprived him of his right to free speech and association under the first amendment. He also complained that defendants violated his right to the equal protection of laws under the fourteenth amendment. On February 8, 1991, defendants answered the complaint and filed five motions for summary judgment, raising a flurry of arguments.

## III. ANALYSIS

The standards governing summary judgment motions are well settled. The task of the Court is to determine whether the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991). The Court's task in reviewing the motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Moreover, the Court must view the facts and all reasonable inferences which may be drawn from them in a light most favorable to the non-movant, and where there are doubts as to whether a

genuine factual dispute exists, the Court must resolve them in favor of the non-movant. *New Burnham Prairie Homes, Inc. v. Burnham,* 910 F.2d 1474, 1477 (7th Cir.1990).

## A. Qualified Immunity on the First Amendment Claim

■ Defendants claim that they are entitled to qualified immunity on the first amendment claim. Under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "governmental officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. To prove the presence of a clearly established right, the plaintiff must point to closely analogous cases decided prior to defendants' challenged actions. *Rakovich v. Wade,* 850 F.2d 1180, 1205 (7th Cir.) (*en banc*), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

In *Harlow,* the Supreme Court articulated the following test:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738. In *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Court embellished the *Harlow* test by add-ing that it provides "ample protection to all but the plainly incompetent or those who knowingly violate the law.... [I]f officers of reasonable competence could disagree on this issue, immunity should be recognized. *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. Most recently in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court set out the specificity required in defining the right in the immunity context. The identification of a clearly established right is not to be determined in broad terms. *Id.* at 639, 107 S.Ct. at 3038.

> It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the previous action has been held unlawful, but it is to say that in the light of the preexisting law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039 (citations omitted).

■ O'Connor would have the Court probe defendants' mental processes to see what they knew about O'Connor's investigative activities, and the filing of his lawsuit, and whether they fired him for these acts or because of his insubordination. But *Harlow* eliminated the subjective component from official immunity because searching for intent and other components of knowledge blocks the use of immunity as a shortcut to a decision. *Elliott v. Thomas,* 937 F.2d 338, 344 (7th Cir.1991). To address this problem, the Court must conduct a two-part analysis: (1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question? *Rakovich,* 850 F.2d at 1210. Intent is relevant to (1) but not to (2). *Id.* Thus under part (1), O'Connor's supported allegations are assumed true, including in-

tent as to any alleged retaliation for his whistleblowing activities.

In considering this qualified immunity claim on summary judgment, the Court must examine all the undisputed evidence in the record. *Rakovich,* 850 F.2d at 1205. This examination includes information possessed by defendants. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040. Therefore as to the first prong, the Court will assume, as supported by the demotions given to O'Connor, Roth and Zelkovich following their investigations, that defendants retaliated against O'Connor for his whistleblowing activities. At the same time, the record establishes extensive—even comprehensive—insubordination on O'Connor's part that is not connected to his first amendment activities, such as: his refusal to complete assignments from his supervisor, May; his failure to report back to Paaswell on the Art's investigation; his rude and insulting behavior towards May; and his refusal to meet with May to review his job performance. At almost every corner, May and Paaswell faced an employee whose tongue was laced with venom. The vitriolic tenor of O'Connor's remarks went beyond any reaction to the alleged retaliation that he faced. In the end however, O'Connor has set out a constitutional violation despite the existence of mixed motives.

■ The Court can now turn to part (2) of the approach and conduct the qualified immunity analysis. In this case, the facts have been fully developed and are therefore sufficient to decide the immunity question. The issue in this case is whether or not it was clear in 1987 that to fire an employee who had engaged in extensive whistleblowing activities but who was otherwise insubordinate and failed to complete his job duties violated the employee's constitutional rights. Both parties have missed the point here. In their brief, defendants have framed the issue this way: whether it was clearly established in 1987 that defendants struck an unlawful balance in responding to O'Connor's speech and

insubordination. (Defendant's Brief at 14). This gloss of the issue is too general. *See Rakovich,* 850 F.2d at 1209 (test for immunity is whether the law was clear in relation to the specific facts confronting the public official when he or she acted). In response, O'Connor argues that defendants do not claim to have engaged in any balancing test when they discharged him. (Plaintiff's Response at 28). This, of course, ignores the objective nature of the second prong in the qualified immunity inquiry. *See Elliott,* 937 F.2d at 344. O'Connor also states that defendants deny taking any adverse action against him because of his speech and offer independent reasons for the adverse action. If this were the case, qualified immunity would not apply at all. *See id.* at 342-43.[1] To the contrary, defendants reprimanded O'Connor on at least one occasion because of his first amendment related activities. May and Paaswell placed O'Connor on probation in August 1987 for his refusal to move into the new office, a move that was delayed, as O'Connor made clear, because he insisted on answering a discovery request in this lawsuit from his old office and on CTA time. Because this alleged retaliation was related to O'Connor's first amendment interests, qualified immunity applies to this case.

The Court's characterization of the issue must now be compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law. *Rakovich,* 850 F.2d at 1209. O'Connor bears the burden of establishing the existence of the allegedly clearly established constitutional right. *Id.* Considering the facts of this case, the unlawfulness of the defendants' acts was not "apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. Decisions regarding circumstances similar to this case, where whistleblowing is juxtaposed against major insubordination

---

1. In *Elliott,* one defendant, Bitzer, contended that he did not know about and had nothing to do with the events of which the plaintiff complained. 937 F.2d at 342. Judge Easterbrook wrote that—as a result—Bitzer's appeal had nothing to do with qualified immunity, and the court dismissed it for want of appellate jurisdiction. *Id.*

that is generally not related to the whistle-blowing activity, are rare. The merits of O'Connor's first amendment claim depend on the balancing test articulated in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), under which public employers may consider disruptive speech under some circumstances, but not all. Balancing tests, by their nature, make for difficult predictions regarding the outcome of all but the most obvious cases. *See Rakovich*, 850 F.2d at 1213 (the standard for constitutional rules involving a balancing of competing interests may be clearly established but the application can be so fact dependent that the law can rarely be considered clearly established).

Legal ambiguity in the wake of *Pickering* sets the stage for immunity in this case. *See Elliott*, 937 F.2d at 343 (citing *Greenberg v. Kmetko*, 922 F.2d 382 (7th Cir.1991); *Thulen v. Bausman*, 930 F.2d 1209 (7th Cir.1991)). Although the Supreme Court has been relatively concrete since the 1970's in establishing that the discharge of a public employee in violation of first amendment rights is improper, *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 413, 99 S.Ct. 693, 695–96, 58 L.Ed.2d 619 (1979) (junior high school teacher's loss of job); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (college teacher's loss of job); *Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736–37 (high school teacher's loss of job), the Court has not addressed a mixed motive case such as this one.

O'Connor has identified one Seventh Circuit case which he argues clearly established that the actions of the defendant in this case were unlawful prior to 1987. *See Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982). In *Bart*, a city employee who worked for the mayor claimed that the mayor and his subordinates retaliated against her after her unsuccessful electoral bid to become the mayor. *Id.* at 624. The harassment campaign included such things as holding her up to ridicule for bringing a birthday cake to the office on the occasion of the birthday of another employee, even though such festivities were common place in the office. *Id.* In recognizing the first amendment claim, the court stated that "we cannot say as a matter of law that the exercise of First Amendment rights by public employees cannot be deterred by subjecting employees who exercise them to harassment and ridicule through selective enforcement of work rules." *Id.* at 625.

The *Bart* case has little application to the present case except for the most general proposition that harassment for exercising the right to free speech is actionable. Like the first amendment itself, the discussion in *Bart* would have given little direction to O'Connor's supervisors in confronting the problem they had with O'Connor. *See Greenberg*, 922 F.2d at 383–84. *Bart* did not involve extensive and documented insubordination on the part of the employee, or an employee who refused to complete job-related tasks. Both of these factors make the outcome of the *Pickering* balancing test more unpredictable in this case.

This is not a case like *Auriemma v. Rice*, 910 F.2d 1449 (7th Cir.1990) (*en banc*), where the defendant gave the plaintiff all the ammunition necessary to avoid summary judgment on qualified immunity. *See Elliott*, 937 F.2d at 345. In that case, after demoting white police officers and promoting black officers over them, the chief of police denied having an affirmative action plan, which supported an inference that the chief had an improper intent and was not confused by the perplexing state of the law concerning affirmative action.[2] *Auriemma*, 910 F.2d at 1451. An objective supervisor looking at the law in 1987 as it related to O'Connor's position would have been confused, and unlike the police chief in *Auriemma*, the defendants in this

**2.** The Court has carefully worked its way through the labyrinthine law of qualified immunity as it has been articulated by both the Supreme Court and the Seventh Circuit in recent years. Having done so, the Court would be remiss if it did not point out that, despite protestations to the contrary, the *en banc* court in *Auriemma* appears to have injected intent into the second prong of the two part inquiry expounded in *Rakovich*, 850 F.2d at 1210, implying that this part of the inquiry is not entirely objective.

case have not advanced a claim to the contrary.

The state of the law on mixed-motive firings, like transfers, was in 1987 sufficiently ambiguous to support immunity and remains so today. *See Elliott,* 937 F.2d at 346; *Rakovich,* 850 F.2d at 1213. This is particularly the case where the employee has engaged in consistent insubordination and routinely failed to perform his job duties. Therefore, the Court holds that defendants are entitled to qualified immunity on the first amendment claim.[3]

*B. Equal Protection*

■ As to O'Connor's equal protection claim, defendants argue that his claim must fail because he has presented no evidence that he was treated differently from similarly situated African–Americans or non-whistleblowing employees. An essential element of recovery under § 1983 is a demonstration of a constitutionally protected right. In order to establish a *prima facie* case of discrimination violative of the equal protection clause, O'Connor must demonstrate that he was treated differently from other similarly situated employees. *Sims v. Mulcahy,* 902 F.2d 524, 538 (7th Cir.1990). This he has not done. Although much of the complaint is devoted to detailing the poor treatment he received by reason of his membership in a particular group or class, neither the complaint nor his subsequent filings establish that non-whistleblowing employees or African–American employees in comparable positions were treated any differently than O'Connor. This elementary defect in the pleading dooms it to failure.

In response to the defendant's motion for summary judgment, O'Connor states that a number of white employees received the same kind of mistreatment as him. (Plaintiff's Response at 29). He claims that "Lorene Murray, John Powers, Kevin Stankovich, Dr. McNabola, Jon Roth, Peter Zelkovich, [and] John Billis" all were mistreated at the CTA. He goes on to state that "at least 47 white employees" filed proceedings alleging that they were harassed. These claims were not supported by the record, except perhaps as they relate to Roth and Zelkovich.

As the Court was about to issue the opinion in this case, O'Connor filed a motion for leave to file parts of a trial transcript from *McNabola v. Chicago Transit Authority,* No. 88 C 6811. These transcripts include an assertion by a former Board member, John Hoellen, regarding the grievances filed by 47 white employees. (Plaintiff's Supplement, Exhibit B at 425). Other testimony in the transcripts relates to Hughes and the work environment in the Law Department.

The testimony relating to the 47 grievances is not helpful because even assuming these employees were harassed, the plaintiff has still failed to show that other similarly situated employees were treated differently. The evidence regarding Hughes has little value absent a showing that the employees in her department—mostly lawyers—were similarly situated to O'Connor. At best this evidence shows that the CTA treated some white employees poorly. It does not show that African–American employees or non-whistleblowing employees were treated differently. For these reasons O'Connor's equal protection claim must fail.[4]

---

3. Given the Court's resolution of the first amendment claim on qualified immunity, the Court need not address the alternative argument that the claim must fail under the *Pickering* balancing test. The Court notes, however, that it would have serious doubts that a motion for summary judgment could be granted in favor of defendants on this issue given the facts in this case.

4. The defendants also contend that they are all qualifiedly immune on the claims that they devised a race-conscious employment plan because at the time of the events of this case, it

was not clearly established that the plan was unlawful. Because O'Connor has failed to state an equal protection claim, the Court need not address this issue. The Court also need not address the three other motions for summary judgment regarding O'Connor's claims against the CTA, Hughes, and Medley.

The Court has presented the facts in this case in the light most favorable to O'Connor, provided that there is some support in the record. Therefore his motions to strike the assertions of the defendant that are unsupported by the record are denied.

## IV. CONCLUSION

Because it was not clearly established in 1987—and indeed not to this day—that an employer could not fire an employee who in addition to being a whistleblower was insubordinate and ineffectual in his job, defendants are entitled to qualified immunity on the plaintiff's first amendment claim. The *equal protection claim fails because the* plaintiff has failed to show that he was treated differently from other similarly situated employees. For these reasons, the Court grants the motion for summary judgment in favor of defendants.