Radomir **RADIC**, Plaintiff,

v.

**CHICAGO TRANSIT AUTHORITY,**
**Defendant.**

No. 92 C 3445.

United States District Court,
N.D. Illinois,
Eastern Division.

March 7, 1995.

Stacey Lynnette Beckman, Kenneth N. Flaxman, Kenneth N. Flaxman, P.C., Jennifer A. Trofa, Chicago, IL, for plaintiff.

Barry S. Alberts, Catherine Masters Epstein, Patricia J. Thompson, Hallie Joan Miller, Schiff, Hardin & Waite, Chicago, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court is Defendant's motion for summary judgment. For the following reasons, the motion is granted.

### FACTS [1]

On May 26, 1992, Radomir Radic ("Radic") filed suit against the CTA, his former employer, under 42 U.S.C. § 1983. Radic claims that he was not returned to work after disability leave in retaliation for exercising his First Amendment right to free speech. The court has jurisdiction under 28 U.S.C. § 1331.

Radic was a CTA employee for approximately ten years. He was hired by the CTA in 1984 as a Civil/Structural Design Draftsman. Among Radic's duties was the preparation of "flange-angle books." A "book" consists of dimensions for the fabrication of

---

1. The facts are taken from the parties' submissions pursuant Local Rules 12(M) and 12(N) of the United States District Court for the Northern District of Illinois.

steel parts which are used to repair or renew parts of the elevated train structure. The proper method of preparing these "books" became an issue within Radic's department in mid 1987. Radic disagreed with the CTA's position regarding the primary source of information for fabricating flange-angles.

In June 1987, Radic sent a memorandum to David Hillock, Manager of Facilities Engineering and Maintenance, advocating the implementation of a flange-angle measuring procedure that would use original shop drawings.[2] The CTA considered Radic's proposals.[3] In addition, Radic attended a meeting with engineering supervisors and observed the renewal of flange-angles in the field. However, dissatisfied with the response from his superiors, Radic conveyed his concerns to top CTA administrators. Radic criticized the CTA's reliance on field measurements because, in his view, the procedure was both wasteful and unsafe.

In a memorandum dated July 12, 1988, Glenn Zika, Supervisor of Structure Construction, discussed adjustments to the CTA's flange-angle measuring procedure. Later that year, Paul Swanson, Acting Manager of Facilities Engineering, described Radic as "instrumental in the review of methodology for structural component renewal" and recommended him for promotion. Following these events, the CTA began looking for a consulting firm in the Fall of 1988 to review its methods of structure renewal. In December 1988, a Senior Structural Engineer, D.F. Penepacker ("Penepacker"), wrote a memorandum, signed by four engineering supervisors, which outlined the CTA's revised procedure for specifying flange-angles for fabrication. The procedure called for the use of both original shop drawings and field verification. *Id.* In April 1989, the CTA entered into a contract with Parsons, Brinckerhoff, Quade and Douglas, Inc. ("PBQD"). Radic had opportunities to meet with PBQD engineering consultants prior to the issuance of their final report in August 1989.

However, Radic was not satisfied with the CTA's actions, and he made his views known. Radic wrote several letters during his tenure at the CTA wherein he referred to specific superiors as "instinct killers" and the "magic circle." Radic's concerns were heard by local, state, and federal officials. In response to a letter written by Radic to President George Bush, the United States Department of Transportation's Urban Mass Transportation Authority ("UMTA") reviewed the CTA's methodology for replacing flange-angles on the rapid transit structure.

During this time, however, Radic's disagreement with the CTA's engineering methods also prompted his refusal to follow the directives of his superiors. In November 1988, Radic was subject to disciplinary action which resulted in a final caution by the CTA. In the Summer of 1989, Radic was assigned to complete writing dimensions in tables for the Loop Expansion Devices. Radic questioned the assignment and thereafter refused to follow his superior's direction. *Id.* On June 5, 1989, in an internal memorandum addressed to Radic, Penepacker repeated his instructions and warned that refusal to comply may result in disciplinary action.

Between June and August 1989, a disciplinary conference was set and then repeatedly rescheduled due to Radic's absence. In 1989, Radic called in sick or failed to report to work on 97 days. During part of that time, Radic was treated by a psychiatrist for stress. In December 1989, one superior recommended Radic's discharge. However, Radic was disciplined by having the days he missed during August 1989 considered a suspension and the days missed between August and December considered sick leave.

In 1990, Radic continued his refusal to employ what he believed to be unsound engineering methods. After missing over thirty days in August and September, Radic was placed on sick leave as of October 8, 1990.

2. Prior to 1972, the CTA had utilized shop drawings to generate flange-angle books. However, the CTA replaced that method with one that required actual field measuring of the parts to be replaced. The latter method was the one in place when Radic joined the CTA in 1984.

3. At least four memoranda written by various engineering supervisors discuss the propriety of using shop drawings as an alternative to field measuring.

On December 6, 1990, Radic's doctor recommended one month sick leave and the CTA complied by placing him on disability leave. At that time, Radic was placed in an administrative classification called "Area 605."[4] Pursuant to his doctor's recommendations, Radic remained on disability leave through April 15, 1991, when he was found fit to return to work. During his absence, however, the CTA filled Radic's former position. Thus, Radic remained in Area 605 and was not returned to work. In February 1994, Radic was notified that he had been "administratively separated" from the CTA.[5]

On May 26, 1992, Radic filed his complaint pursuant to § 1983, alleging that the CTA deprived him of his right to free speech under the First Amendment. On May 27, 1994, the CTA filed the instant motion for summary judgment, raising several arguments.

### DISCUSSION

■ The standards governing motions for summary judgment are well settled. The court's task is to determine whether the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991). The party opposing the summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed.R.Civ.P. 56(e). Rather, the nonmovant must respond with "specific facts showing that there is a genuine issue for trial." *Id.* However, where there are doubts as to whether a genuine factual dispute exists, they must be resolved in favor of the nonmovant. *O'Connor v. Chicago Transit Authority,* 778 F.Supp. 967, 971, 972 (N.D.Ill. 1991) (citing *New Burnham Prairie Homes,*

*Inc. v. Burnham,* 910 F.2d 1474, 1477 (7th Cir.1990)). "The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). With this in mind, we turn to the factual basis of Radic's claims.

■ In this case, there is no direct evidence that the CTA Board had a formal policy of terminating employees in retaliation for "whistle-blowing" and Radic does not claim otherwise. Rather, Radic claims that his placement into Area 605 was part of the CTA's overall plan to retaliate against him. Specifically, Radic contends that Nuria Fernandez, Deputy Executive Director of Capital Planning and Construction, and Cheri Heramb, Manager of Engineering and Construction Programs, made a series of retaliatory decisions. The decisions include the following: decisions not to provide information to Radic on Area 605 procedures; not to inform Radic of employment opportunities; and not to notify the appropriate managers that he was able to return to work. Radic claims that these actions provide a basis for municipal liability because Fernandez and Heramb had the authority to make final decisions regarding his Area 605 status. In support of his theory, Radic cites *Cornfield v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1324 (7th Cir.1993), which states that "[i]n order to establish the existence of a [municipal] policy, a plaintiff may look to ... actions by individuals with final decisionmaking authority." Since Fernandez and Heramb are decisionmakers, Radic concludes that they are also policymakers whose actions are attributable to the CTA.

■ The CTA argues that municipal liability attaches only when the decisionmaker possesses the authority to establish policy.[6]

---

**4.** The procedures governing Area 605 as applied to non-union employees, like Radic, are unclear. CTA Personnel Administrator Geri Tapling testified that placement in Area 605 typically occurs when an employee has been disabled for two months or more. If an Area 605 employee's disability ends, a non-union employee may either return to his previous job if it is vacant or apply for other vacancies. *Id.* Although the procedures are unwritten for non-union employees, it was the CTA's practice to give employees in Area

605 a maximum of three years to find placement. *Id.*

**5.** Administrative separation constitutes a termination from the CTA without a negative connotation.

**6.** The CTA also argues that Radic's failure to designate witnesses and exhibits in the Final Pretrial Order entitles the CTA to judgment. No-

The court agrees. "[T]he decisions of an employee without authority to set official policy provide an insufficient basis for the imposition of liability against the governmental entity under section 1983." *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 510 (7th Cir.1993) (citations omitted). Similarly, in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986), the Supreme Court stated that, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Thus, assuming that Fernandez and Heramb were the final decisionmakers in this case, the CTA is liable for their actions only if they possessed the requisite policymaking authority.

■ Courts must look to state law in identifying those vested with the authority to make policy. *McNabola*, 10 F.3d at 510 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124–25, 108 S.Ct. 915, 924–25, 99 L.Ed.2d 107 (1988)). The Seventh Circuit stated in *McNabola* that "[t]he Board of Directors of the Chicago Transit Authority is the final policy-making authority for establishing the employment practices of the Chicago Transit Authority." *Id.*

The question, then, is whether an official policy of the CTA Board commanded Fernandez and Heramb to deprive Radic of his constitutional rights. The answer to that question is no. In fact, Radic concedes that the evidence would not support a finding of an official command by the CTA Board to retaliate against employees who exercise their right to free speech. This concession is inherent in Radic's argument that Fernandez and Heramb had final decisionmaking authority.[7] Simply put, neither Fernandez nor

Heramb had the authority to establish official CTA policy.[8] To find otherwise would amount to holding the CTA vicariously liable for the independent acts of its employees. This result is expressly prohibited by *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ *Monell* established that municipalities may not be held liable under § 1983 under a theory of respondeat superior. *Id.* at 691, 98 S.Ct. at 2036. "Recovery from a municipal entity is therefore 'limited to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered.'" *McNabola*, 10 F.3d at 509 (citing *Pembaur*, 475 U.S. at 480, 106 S.Ct. at 1298–99). An individual cannot make policy unless granted that authority under the applicable state law. *See, e.g., Smith v. Daley*, No. 94 C 920, 1994 WL 325749 (N.D.Ill. July 5, 1994) (holding that the mayor and the alderman are authorized policymakers under Illinois law). Thus, in the absence of a formal policy, Radic must rely on a theory of custom or practice to establish a basis for municipal liability.

■ The imposition of liability against the CTA may be proper when "the Board acquiesced in a longstanding practice or custom which, although not the official policy of the Board, constituted a standard operating procedure of the Chicago Transit Authority." *McNabola*, 10 F.3d at 510. Radic has not effectively argued the existence of a longstanding practice or custom of retaliation. Although Radic alleges in his Complaint that the CTA has a custom of taking retaliatory acts against its employees, he has not come forward with any evidence from which a reasonable jury could find in his favor.[9] There-

tably, the CTA cites no authority to support its position, and the court declines to base judgment on Radic's failure to submit a pretrial order. *See Bank of Chicago/Lakeshore v. Menaldi*, 814 F.Supp. 685, 690 n. 11 (N.D.Ill.1992).

7. In his brief, Radic contends that Fernandez and Heramb acted independently and that no one reviewed or had knowledge of their decisions.

8. Since the independent actions of Fernandez and Heramb do not give rise to the CTA liability,

it is unnecessary to reach the CTA's argument that no improper retaliation occurred.

9. The only evidence Radic cites to support this proposition is several retaliation cases filed against the CTA. Defendant's Rule 12(M) Statement, ¶ 6; Plaintiff's Response. Radic's blanket denial of ¶ 6, without citation to record support is insufficient to create an issue of fact. *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir.1990). Such anecdotal evidence has no value by itself. Radic makes no attempt to establish the relevance of any of these lawsuits to the

fore, after reviewing the record in the light most favorable to Radic, the court finds that the plaintiff has failed to show that there is a genuine issue of material fact concerning either a policy or custom of the CTA to retaliate against its employees for exercising their right to free speech under the First Amendment. Accordingly, the court grants the CTA's motion for summary judgment.

## CONCLUSION

For the reasons stated above, the CTA's motion for summary judgment is granted.

IT IS SO ORDERED.

issues in this case. The mere filing of a complaint does not establish the truth of the assertions contained therein.