# Illinois Official Reports

## Appellate Court

***Hubert v. Board of Education of the City of Chicago*, 2020 IL App (1st) 190790**

| | |
|---|---|
| Appellate Court Caption | JEFFREY HUBERT, Plaintiff-Appellant, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Defendant-Appellee. |
| District & No. | First District, First Division<br>No. 1-19-0790 |
| Filed | June 29, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-1507; the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Shawn S. Kasserman, Patrick J. Giese, and Patrick M. Grim, of Tomasik, Kotin & Kasserman, LLC, of Chicago, for appellant.<br><br>Nadine Claire Abrahams and Sabreena Torez El-Amin, of Jackson Lewis LLP, of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE GRIFFIN delivered the judgment of the court, with opinion.<br>Justices Hyman and Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Jeffrey Hubert, worked for Chicago Public Schools managing bus transportation services for students. Hubert became aware that private bus vendors that the school system had hired were overbilling for their services and otherwise committing fraud against the school system. Hubert worked to root out the fraud by voicing concerns within the school system and by meeting with law enforcement. His employment with Chicago Public Schools was terminated, and he contends that he was fired for working to expose the fraud.

¶ 2    Defendant, the Board of Education of the City of Chicago (Board of Education or Board), claims that Hubert's work to expose fraud has nothing to do with his termination. Hubert had a well-documented history of treating his colleagues and subordinates in an unprofessional manner, including multiple verbal altercations with coworkers. Hubert also clashed with his superiors, and he had trouble taking direction. The Board of Education claims that Hubert was fired for insubordination and divisive workplace conduct.

¶ 3    Hubert brought this case for retaliatory discharge and violations of the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)). The Board of Education moved for summary judgment arguing that it had valid, nonretaliatory reasons for terminating Hubert's employment. The trial court agreed and granted summary judgment in favor of the Board of Education. Hubert appeals. We conclude that the motive for Hubert's discharge is an unresolved genuine issue of material fact. Accordingly, we reverse and remand for further proceedings.

¶ 4                                        I. BACKGROUND

¶ 5    Plaintiff, Hubert, was hired by the Chicago Public Schools' Student Transportation Services in January 2013 as the director of transportation operations. Student Transportation Services manages the yellow bus services for Chicago Public Schools. The transportation services department manages 1600 school buses per day that are responsible for transporting 22,000 Chicago Public Schools students. Yellow bus services for Chicago Public Schools are provided by third-party vendors that enter into contracts with the defendant Board of Education. In Hubert's role as director of Student Transportation Services, one of his responsibilities was to assess that the costs for yellow bus services were honest and fair. His job duties expressly included increasing efficiencies and identifying ways to save Chicago Public Schools money.

¶ 6    Every few years, the Board of Education solicits bids from private vendors for yellow bus services and awards contracts. In 2013, the Board undertook that process. In the 2013 bidding period, Hubert became suspicious of the bidding because several of the vendors submitted very similar pricing. It was apparently well known within the ranks of the Student Transportation Services department that a number of bus vendors acted cooperatively in certain areas, such as that they shared facilities and attorneys and even referred to themselves cooperatively as "the Association." Hubert suspected that the bus vendors were engaged in price fixing and perhaps other improper practices. Hubert informed his supervisor, Paul Osland, about the suspicious activity. In response to Hubert voicing his concerns about the potentially improper activity by the bus vendors, Osland sent an e-mail to the inspector general of the Chicago Public Schools.

¶ 7    Hubert continued to investigate and discover other seemingly improper activity by the bus vendors who were taking advantage of Chicago Public Schools and the taxpayers. Hubert

learned that in the run up to the 2013 bidding, Jewel's Bus Company (Jewel's) had admitted to billing Chicago Public Schools for services it never performed. Hubert informed his supervisor, Osland, about this additional information. When representatives from Jewel's met with Hubert and the other members of the team awarding contracts in 2013, Hubert confronted the representative from Jewel's and expressed his opinion that Jewel's should not be awarded any contracts because the company had stolen from the school board and the Chicago taxpayers. Jewel's general counsel was upset by Hubert's conduct at the meeting and expressed that displeasure to Osland. Hubert was subsequently removed from the team awarding the 2013 contracts, and Jewel's was one of the vendors awarded a contract.

¶ 8    Even after Hubert was removed from the process and the contracts were awarded, Hubert continued to investigate Jewel's. The Board of Education conducted and investigation and concluded that Jewel's overbilled Chicago Public Schools for well over $1 million and likely over $2 million. The Board terminated its contract with Jewel's for 2014. Hubert believed that there was additional fraudulent activity occurring in regard to school bus services. Hubert discovered that vendors were taking advantage of the pay structure by driving wildly inefficient routes to and from the schools because one of the components of their pay was mileage. So the vendors would make stops out of order, back track, and so on, in order to maximize the mileage component of their pay. Hubert also discovered that the vendors would sometimes report that they were running two buses and bill for using two buses when they would actually combine the run and only use one bus.

¶ 9    Hubert was displeased at the lack of effort expended to investigate or put a stop to the bus vendors' supposed collusion and fraudulent activity. However, Hubert and Osland met with the inspector general for the Chicago Public Schools on multiple occasions to discuss the matter. After the meetings between Hubert, Osland, and the inspector general, Hubert continued to meet with the inspector general on his own. Additionally, and unbeknownst to Hubert, Osland continued to work with the inspector general on the issue too. Osland also involved the United States Attorney's Office. The U.S. Attorney eventually brought criminal charges against Jewel's for its fraudulent dealings. It seems apparent that Hubert was unaware of the steps that Osland was taking to address the issue.

¶ 10    In his day-to-day duties, Hubert continued to take steps to ameliorate the fraudulent activity by the school bus vendors. Hubert ordered that the buses be tracked and monitored by cameras and GPS when possible. Hubert claims that he consistently complained within the department and to his supervisors that the vendors were corrupt and that his department, Student Transportation Services, was complicit in the corrupt scheme. Hubert contends that Osland interfered with his efforts aimed at combatting fraud. For example, Hubert points out that Osland reversed financial sanctions Hubert levied against a vendor and that Osland worked to limit Hubert's contact with the school bus vendors. Fed up with the efforts to stem the theft from the schools, in November 2013, Hubert met with representatives of the Federal Bureau of Investigation, the Office of the Inspector General, and the Department of Education about the fraud he was witnessing.

¶ 11    After Hubert met with law enforcement, he received an e-mail from Osland with a link to an opinion in a legal case. The e-mail states that the case deals with a Chicago Transit Authority employee who was fired for whistleblowing against a company that was fraudulently overbilling the CTA for "stuff not run." See *O'Connor v. Chicago Transit Authority*, 778 F. Supp. 967, 968 (N.D. Ill. 1991). Hubert claims that he took the e-mail to be an

acknowledgement that Osland knew he had met with law enforcement, and Huber considered the e-mail to be a threat that he would also be fired for pursuing his claims of fraudulent overbilling by the bus vendors.

¶ 12    Along with being aggressive and outspoken about his displeasure with the vendors' behavior, Hubert exhibited an aggressive management style with his colleagues. In documents prepared for this case, Hubert's subordinates remarked about his bad temper and they maintained that his management style was unprofessional and led to a stressful work environment. Subordinates recalled several occasions in which Hubert yelled or raised his voice at staff members. Hubert also had documented verbal altercations with at least two of his coworkers, Kristin Lausman and Megan Wilson. Osland was well informed about Hubert's confrontations with his coworkers. Osland counseled Hubert during almost the entirety of his employment about his conduct toward his peers and subordinates. Hubert's coworkers felt that Hubert made their jobs more stressful, and they stated that his condescending behavior toward them was disruptive and unprofessional.

¶ 13    The two tracks of concurrent events that occurred at the beginning of 2015 deserve close inspection because Hubert claims that one track of events led to his termination while the Board of Education claims that the other track led to his termination. On January 23, 2015, apparently still being unsatisfied with the school bus vendors' fraudulent conduct and with his lack of progress in exposing their fraud, Hubert contacted the Safety and Security Department of Chicago Public Schools seeking to access surveillance video. According to Hubert, Osland did not appreciate Hubert's course of action. Hubert claims that when he took the step of pressing his concerns outside Osland's department, he had finally gone too far in advancing his concerns about the fraudulent activity and, thus, his employment was terminated.

¶ 14    Meanwhile, however, on January 28, 2015, Osland met with both Hubert and Lausman, one of the women with whom Hubert had documented verbal altercations. Osland attempted to smooth things over between the two. At the end of the meeting, Hubert and Lausman shook hands and agreed to work better together from that point forward. However, a week later, on February 6, 2015, Hubert turned around and forwarded Lausman a 2014 e-mail that was critical of her job performance and questioned her integrity. The Board of Education claims that Hubert had finally gone too far in mistreating his colleagues and engaging in inappropriate workplace behavior and, thus, his employment was terminated.

¶ 15    On February 12, 2015, Osland informed Hubert that he was fired. Osland cited insubordination and divisive conduct with coworkers as the reason for Hubert's employment being terminated. Hubert believes he was fired for his relentless investigation into the fraudulent activity by the school bus vendors and for engaging resources outside Osland's department to address the corrupt practices.

¶ 16    After being fired, Hubert filed this case. Hubert claims that he is entitled to recover for retaliatory discharge and for violations of the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)). The Board of Education moved for summary judgment. The Board of Education argued that Hubert was fired for insubordination and for engaging in unprofessional conduct, not for engaging in protected activity. The trial court agreed with the Board of Education and granted its motion for summary judgment. In ruling in the Board of Education's favor, the trial court focused on causation, and it found that there was no genuine issue of material fact regarding the Board's motive for firing Hubert. Hubert appeals.

¶ 17                    II. ANALYSIS

¶ 18    Hubert appeals from the trial court's order granting the Board of Education's motion for summary judgment. Summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits, viewed in a light most favorable to the nonmovant, fail to establish that a genuine issue of material fact exists, thereby entitling the moving party to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2016); *Fox v. Seiden*, 2016 IL App (1st) 141984, ¶ 12. If disputes as to material facts exist or if reasonable minds may differ with respect to the inferences drawn from the evidence, summary judgment may not be granted. *Fox*, 2016 IL App (1st) 141984, ¶ 12. We review a trial court's decision to grant summary judgment *de novo*. *Illinois Tool Works Inc. v. Travelers Casualty & Surety Co.*, 2015 IL App (1st) 132350, ¶ 8.

¶ 19    Hubert's complaint contains two causes of action: retaliatory discharge and violation of the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)). We begin with addressing the propriety of the trial court granting summary judgment in favor of the Board of Education on Hubert's claim for retaliatory discharge.

¶ 20    To establish a claim for retaliatory discharge, a plaintiff must establish that (1) the employer discharged the plaintiff, (2) in retaliation for the plaintiff's protected activities, and (3) the discharge violates a clear mandate of public policy. *Fox v. Adams & Associates, Inc.*, 2020 IL App (1st) 182470, ¶ 62. In this case, the parties agree that only the second element, causation, is at issue, and they limit their arguments to that issue on appeal. The trial court held that, as a matter of law, Hubert could not prove that his termination was the result of retaliation for Hubert reporting criminal activity.

¶ 21    Our supreme court has made clear that an employee's cooperation with law enforcement to root out criminal activity is in accord with the public policy of Illinois. *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 132-33 (1981). An employer may not discharge an employee for cooperating with law enforcement. *Id.* at 133. Hubert contends that he was fired for just that, so he argues that the trial court should not have granted summary judgment against him.

¶ 22    The Board of Education maintains that Hubert was fired for a nonretaliatory, nonpretextual reason. The Board argues that Hubert cannot establish the causation element of his retaliatory discharge claim—that it acted with a retaliatory motive. When deciding element of causation in a retaliatory discharge cases, the ultimate issue to be decided is the employer's motive in discharging the employee. *Michael v. Precision Alliance Group, LLC*, 2014 IL 117376, ¶ 31. The element of causation is not met if the employer has a valid, nonpretextual basis for discharging the employee. *Grabs v. Safeway, Inc.*, 395 Ill. App. 3d 286, 291 (2009).

¶ 23    The Board of Education contends that the undisputed evidence in the record establishes that Hubert's employment was terminated for legitimate, nonretaliatory reasons—insubordination and inappropriate behavior toward coworkers. The Board points to the record evidence that several of Hubert's colleagues and subordinates reported that he acted inappropriately and unprofessionally. Osland, Hubert's supervisor, admonished Hubert on multiple occasions about his coarse workplace demeanor and his proclivity to lose his temper with colleagues. Consistent with Osland's deposition testimony, the Board of Education argues that Hubert's e-mail to Lausman was the final straw and that Hubert deserved to be fired.

¶ 24    We are presented with a classic case of both sides presenting evidence to support their positions and advancing a narrative that could be true. In such a case, summary judgment is not appropriate. Our role in reviewing a summary judgment decision is not to evaluate the

quality of the evidence or argument but, rather, to evaluate whether any evidence exists from which a fact finder could conclude that the party proved the elements of the cause of action. *Merca v. Rhodes*, 2011 IL App (1st) 102234, ¶ 46.

¶ 25    In a retaliatory discharge action, the issue of an employer's true motive in terminating an employee is a question of material fact, not normally suitable for resolution on summary judgment. *Hugo v. Tomaszewski*, 155 Ill. App. 3d 906, 909-10 (1987); *Miller v. J.M. Jones Co.*, 225 Ill. App. 3d 799, 804 (1992). In this case, Hubert has presented evidence that he continually pressed his concerns about fraud and corruption among school bus vendors contracting with Chicago Public Schools. Hubert ruffled feathers along the way. For example, Osland had to remove Hubert from his role in the 2013 bus vendor bidding process because Hubert brazenly confronted a vendor about its fraudulent activity. Hubert did not see the other members of his department taking the fraud seriously, so he continued to press forward even when others seemed hesitant to meaningfully address the issue. Osland apparently wanted to move Hubert to a warehouse job, and he eventually did move Hubert to different duties where Hubert would not have contact with vendors. Furthermore, Hubert and Osland had disagreements about how to deal with the fraud that continued even after Hubert made everyone aware of what was occurring. So, frustrated with the inaction, Hubert went to law enforcement with his concerns. He later went outside of Osland's department within Chicago Public Schools with his concerns and he was fired three weeks later.

¶ 26    There is evidence on file that evidences Osland's frustration with Hubert disclosing information about vendor fraud and also about the means by which Hubert was trying to expose and eliminate the fraudulent activity. Osland also expressed frustration with Hubert making departmental business public, and he cited those frustrations as support for Hubert's termination. A vendor also contacted Osland to express frustration with Hubert because the vendor found Hubert to be unwilling to bend to vendor demands—demands that Hubert construed to constitute complicity to theft from Chicago Public Schools. Hubert averred in an affidavit submitted in response to the motion for summary judgment that Osland was displeased with Hubert's dogged attitude to eliminating theft, and Osland ordered a halt to Hubert's initiation of an audit of the vendors' overbilling. Hubert contends that it was his crusade to eliminate theft from the schools, which no one else seemed to prioritize, that bothered and scared Osland, and that led to the termination of his employment.

¶ 27    On the other side of the equation, Hubert clearly had trouble comporting his behavior to the workplace standards that were expected of him. He had trouble getting along with his colleagues, his subordinates, and his superiors. Even though Osland occasionally praised Hubert for his abilities, the record clearly indicates that Osland had to repeatedly admonish Hubert about his improper behavior. Hubert's colleagues that submitted evidence in this case resoundingly stated that he was difficult to work with and that he made their jobs stressful. The record also reflects that Hubert had verbal altercations with multiple fellow employees and that he did not act collegially on many occasions. There is record evidence that Hubert created a stressful work environment and that he treated his colleagues condescendingly, among other things.

¶ 28    Both the above possibilities—Hubert's narrative and the Board of Education's narrative—constitute reasonable explanations for why Hubert's employment might have been terminated. Perhaps it is just a coincidence that Hubert's employment was terminated at the time it was terminated and under the circumstances presented. But in a retaliatory discharge case,

causation may be demonstrated by circumstantial evidence. *Hugo*, 155 Ill. App. 3d at 910. A jury could believe the narrative advanced by Hubert, and that narrative is supported by at least *some* evidentiary facts and the inferences that could be drawn therefrom.

¶ 29 The record seems to provide sufficient cause for the termination of Hubert's employment should a fact finder credit the testimony about Hubert's inappropriate workplace demeanor. But it is for a jury to decide the real reason for the termination of Hubert's employment. See *Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 568 (2008). Was it really insubordination and Hubert's workplace demeanor or is that pretext? As the supreme court explained in *Michael*,

> "when an employer proffers a valid reason for the employee's discharge, this does not automatically 'defeat a retaliatory discharge claim.' However, where, as [t]here, the employer chooses to come forward with a valid, nonpretextual basis for discharging its employees and *the trier of fact believes it*, the causation element required for proving a retaliatory discharge claim is not met." (Emphasis in original.) *Michael*, 2014 IL 117376, ¶ 36.

Here, we must allow the trier of fact to hear the conflicting evidence supporting Hubert's position and the Board of Education's position respectively and then decide which version of events to believe. We cannot say at this stage of the case that the Board of Education has affirmatively proved that its motive for firing Hubert was, in fact, his inappropriate workplace behavior.

¶ 30 Hubert has also submitted evidence that, though admittedly not ideal, Osland and the Department had sometimes praised his aggressive approach to his work. Hubert received praise for his relentless efforts and his "take no prisoners approach." The Board of Education has not demonstrated that there is no genuine issue of fact regarding pretext. See *Herman v. Power Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 364 (2009). Hubert averred in an affidavit submitted in response to the motion for summary judgment that Osland came to him after he took his concerns to a different department in Chicago Public Schools and stated his displeasure with Hubert's conduct. Hubert contends that by taking his concerns outside of Osland's department, Hubert might have created the impression that Osland could not manage his department and, thus, Osland was threatened. Then it was just three weeks later that Hubert's employment was terminated.

¶ 31 The Board of Education contends that summary judgment in its favor was also proper because none of the decisionmakers involved in terminating Hubert's employment knew about his cooperation with law enforcement when they made the decision to fire him. But Osland was one of the decisionmakers in Hubert's termination, and the evidence shows that Osland set the wheels in motion for Hubert being fired. Osland initiated the termination procedures by contacting Tim Cawley and stating that Hubert should be fired. Osland knew that Hubert had worked with the inspector general, and it is Hubert's belief that Osland knew Hubert had worked with law enforcement and was otherwise going outside their department and making noise about the fraudulent activity. Hubert received the e-mail from Osland about another government whistleblower being fired, and Hubert claims that Osland was upset about Hubert going to the Safety and Security Department to further investigate the vendors.

¶ 32 Even if Osland did not know specifically that Hubert was talking to law enforcement, Hubert was a government employee supposedly working to root out fraud against the government and the taxpayers. See *Valentino v. Village of South Chicago Heights*, 575 F.3d

664, 678 (7th Cir. 2009) ("[t]erminating a government employee for speaking out against corruption in her workplace is surely contrary to clearly mandated public policy (the intersection of the First Amendment and the public's right not to be defrauded by its government)" (applying Illinois law)); see also *Brame v. City of North Chicago*, 2011 IL App (2d) 100760, ¶ 8. Hubert's superiors were surely aware that he was pressing the issue of fraudulent activity by the school bus vendors, and there is evidence that Hubert's pursuit of the fraud was bothersome to members of the department, at least when the evidence is considered in a light most favorable to Hubert.

¶ 33  In a retaliatory discharge case, the burden of proof and persuasion shifts back and forth between the discharged employee and the former employer. The former employee must make out a *prima facie* case that his employment was terminated in retaliation for protected activity and in violation of public policy. *Fox*, 2020 IL App (1st) 182470, ¶ 62. Then, if the employer can articulate a legitimate nondiscriminatory reason for the employee's discharge, the burden shifts back to the former employee (*Clark Oil & Refining Corp. v. Golden*, 114 Ill. App. 3d 300, 308 (1983)) who has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true, but a pretext" for an otherwise impermissible retaliatory termination. *Gomez v. The Finishing Co.*, 369 Ill. App. 3d 711, 719 (2006). But the plaintiff does not need *to prove* anything at the summary judgment stage. When the trial court granted summary judgment here, it deprived Hubert of that previously mentioned "opportunity to prove" that the real reason for his discharge was retaliation and that insubordination and divisive workplace conduct were a mere pretext for his termination. The trial court accepted the Board of Education's explanation but in doing so answered a question of fact that should have been reserved for further proceedings.

¶ 34  Summary judgment is a drastic means of disposing of litigation. *Andrews v. Metropolitan Water Reclamation District of Greater Chicago*, 2019 IL 124283, ¶ 20. It should only be granted when a party's right to judgment is clear and free from doubt. *Jones v. Pneumo Abex LLC*, 2019 IL 123895, ¶ 39. In this case, the Board has not affirmatively proved that Hubert cannot make out his retaliatory discharge claim. Being that there is some evidence on file to support Hubert's position on each element of a claim for retaliatory discharge and that he has presented some evidence to create a question of fact about the possibility of pretext, the Board of Education was not entitled to summary judgment. As in *Zuccolo*, a rational trier of fact could find that the Board of Education had a retaliatory motive in discharging Hubert. See *Zuccolo*, 387 Ill. App. 3d at 569. Consequently, a disputed question of fact as to the Board of Education's motivation in terminating Hubert still remains, thereby precluding summary judgment. *Id.*

¶ 35  The analysis of the propriety of the trial court granting summary judgment against Hubert on his claim for violations of the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)) is essentially the same as the analysis set forth above in regard to Hubert's retaliatory discharge claim. For both claims, the trial court ruled that Hubert could not establish causation. Under the Whistleblower Act, "[a]n employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." *Id.* § 15(b).

¶ 36  The trial court's conclusion on this claim was that Hubert could not show that his termination was done in retaliation for his whistleblowing activity because the Board of Education had demonstrated that Hubert was insubordinate and engaged in inappropriate

workplace conduct. However, as discussed at length above, there is a genuine issue of material fact as to the Board of Education's true motive for firing Hubert. Both sides have submitted evidence in support of their positions on the Board's motive, and it is for a fact finder to determine the reason behind Hubert being discharged. The Board's motive is a genuine issue of material fact. Because genuine issues of material fact remain, the trial court should not have granted summary judgment on Hubert's claim for violations of the Whistleblower Act (*Id.* § 1 *et seq.*).

¶ 37                                          III. CONCLUSION

¶ 38          Accordingly, we reverse, and we remand for further proceedings.

¶ 39          Reversed and remanded.